UNITED STATES of America,
Plaintiff,

v.

KOPPERS COMPANY, Inc., and Thomas
Flexible Coupling Company,
Defendants.

Civ. A. No. 792.

United States District Court
W. D. Pennsylvania.

Jan. 9, 1962.

William H. McManus and Zachary Shimer, U. S. Dept. of Justice, Antitrust Division, Washington, D. C., for United States.

John M. Crimmins, Pittsburgh, Pa., for Koppers and Thos. Flexible Coupling.

WILLSON, District Judge.

The complaint in this case was filed by the United States on February 17, 1961. On January 3, 1961, Koppers Company, Inc., acquired the controlling stock interest in Thomas Flexible Coupling Company. The complaint alleges that the acquisition is in violation of Section 7 of the Clayton Act, 15 U.S.C.A. § 18. The preparation and trial of the case has proceeded with dispatch. Counsel for the parties were quick to get to the basic issues through discovery and pretrial, with the result that the case came on for trial at the October, 1961, Non-Jury term at Erie. Briefs have been filed and considered and counsel have been heard at oral argument.

Upon consideration of all the evidence and the law, this court has come to the conclusion that the merger is in violation of Section 7 of the statute and must be set aside.

The issues in the case concern the flexible coupling industry of the country. There is no dispute as to the definition of a flexible coupling. It is a device

which is used to connect rotating shafts, transmit the power from the driving to the driven member, and while so doing, compensate for minor degrees of misalignment. There are various types of flexible couplings such as gear, disc, grid, rubber, jaw and chain, each of which serves the function of connecting rotating shafts, transmitting power from the driving to the driven member, and while so doing, compensating for minor degrees of misalignment, although each may use a different principle to achieve its flexibility.

The defendant, Koppers Company, Inc., hereinafter referred to as Koppers, is a corporation organized and existing under the laws of the State of Delaware with its principal office in Pittsburgh, Pa. Koppers is a highly diversified organization with total sales in 1960 in excess of $300 million. It conducts its business through eight operating divisions, one of which is its Metal Products Division. The Metal Products Division is in turn segmented into various departments, one of which is the Coupling Department which manufactures and sells flexible couplings from its plant in Baltimore, Maryland. These couplings are sold and shipped throughout the United States in interstate commerce.

Thomas Flexible Coupling Company, hereinafter referred to as Thomas, is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal office in Warren, Pennsylvania in this district. Thomas flexible couplings are manufactured in Warren and are sold and shipped throughout the United States in interstate commerce.

In speaking of what each of the defendants manufactures and sells, the court, of course, is referring to that period prior to the merger. Thomas manufactures and sells a disc type flexible coupling. Koppers manufactures and sells a gear type flexible coupling which, as it says in its catalogue, is—

"Based on Gustave Fast's famous patented principle, FAST'S couplings automatically compensate for angular, offset, and angular-offset misalignment."

The formula used by all flexible coupling manufacturers including Koppers and Thomas to determine the size of the coupling to be used is:

$$\frac{H\ P}{R\ P\ M} \times 100 \times \text{Service Factor} = \text{load requirement.}$$

Because the functions of flexible couplings are difficult to accurately portray, the following proposed finding, as submitted by the defendants, is quoted as the government has agreed that it is an accurate statement;

"Metal flexible couplings manufactured and sold by both Koppers and Thomas are used for the general purposes of transmitting power by joining together rotating shafts. They serve three functions: (1) Couple shafts for mechanical power transmission, transferring the torque of one shaft to the other, directly and with constant velocity. (2) Compensate for all types of misalignment between shafts without inducing stresses and loads on the connected equipment and without a tangible loss of power. (3) Compensate for end or axial movement of the coupled shafts, preventing either shaft from exerting a thrust on the other and allowing each to rotate on its normal axial position."

The principal sales of flexible couplings are made to large commercial users of machinery and original equipment manufacturers. Sales are made by means of salaried sales personnel, by distributors, or by sales representatives operating on commission. Total sales of all types of flexible couplings for each of the years 1958, 1959 and 1960 were as follows: (rounded figures)

| 1958 | $23,500,000 |
|------|-------------|
| 1959 | 28,200,000 |
| 1960 | 29,400,000 |

As antitrust cases go, the issues in this case are not complicated. The government contends first that flexible cou-

plings are a line of commerce within the meaning of amended Section 7 of the Clayton Act under the evidence in this case. It is well to emphasize that this is solely a case brought under Section 7 of the Clayton Act as amended in 1950. The pertinent part of that section reads:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

In deciding cases under this section, the courts have in all instances, carefully studied the legislative history of the Clayton Act. The history of this section was cited to this court and is set forth in the briefs, and the court has reviewed the Committee Reports.

United States v. E. I. Du Pont & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), is the landmark case. But it is to be noted however, that the Du Pont case was brought and decided under Section 7 as it existed prior to the 1950 amendment. Recent District Court decisions under the 1950 amendment are United States v. Bethlehem Steel Corporation, 168 F.Supp. 576 (S.D.N.Y., 1958); United States v. Brown Shoe Company, 179 F.Supp. 721 (E.D.Mo., 1959). It is believed that Judge Weinfeld in the Bethlehem Steel case, commencing at p. 581 of 168 F.Supp., has carefully and correctly summarized the legislative history of the Clayton Act and the circumstances which led to the 1950 amendment of Section 7. He cites the Committee Reports and authoritative decisions. He says:

"It is stating a fact of history to say that Congress felt that the Sherman Act passed in 1890 had proved quite ineffective in halting the growth of 'trusts' and monopolies. Huge consolidations and mergers continued to be effected through the purchase of stock and 'trusts' continued to flourish. The evils of corporate mergers and combines with their increasing concentration of power commanded the concerned attention of the nation. The 'rule of reason' enunciated by the Supreme Court in 1911 in Standard Oil Co. [of New Jersey] v. United States [221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619], regarded by many as having weakened the Sherman Act, gave impetus to efforts to secure more effective means of preserving our free enterprise system. Political agitation for curbing the growing power of 'trusts' and the concentration of economic power followed the Supreme Court ruling. In the national campaign of 1912 all major political parties denounced the monopolistic trends and their platforms carried planks for remedial legislation. The leadership in the efforts to strengthen the antitrust laws was assumed by Woodrow Wilson, who thereafter in a series of messages to Congress urged further legislative action. The Congress acted in 1914 by passing the Clayton Act. Its essential purpose was preventative—to check anticompetitive acts in their incipiency before they reached the dimensions of Sherman Act violations. In short, Congress contemplated a standard much less rigorous than that which had become required under the Sherman Act. As stated in the Senate Report on the bill:

" 'Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by (the Sherman Act), or other existing anti-trust acts, and thus, by making these practices illegal to arrest the creation of trusts, conspiracies, and

monopolies in their incipiency and before consummation.'

This has been expressly recognized by the Supreme Court.

"Despite the clear purpose of the original section 7 of the Clayton Act, its objectives were not fully realized. This frustration was generally attributed to a number of factors. First, the statute applied only to acquisitions of stock and did not apply to acquisitions of assets, and even as to stock acquisitions it was interpreted so as not to apply where the stock was used to acquire assets. Second, it was generally assumed that original section 7 did not apply to vertical mergers. The inadequacies of the section, whatever the reasons, were further highlighted by pronounced post war merger activity which resulted in the elimination by large corporations of independent companies in industries which had traditionally been considered small business fields. Congress showed increasing concern with the sharp rise in economic concentration and with the prospect of even greater concentration in the light of the continuing merger trend. Further, the Columbia Steel case brought home the limitations of the Sherman Act in merger cases. It was against this background that Congress amended section 7.

"The 1950 amendment to section 7 expanded its sweep so as: (1) to prohibit the acquisition of assets as well as stock; (2) to broaden the area in which competition may be adversely affected by eliminating the test of whether the effect of the acquisition may be substantially to lessen competition between the acquiring and the acquired corporation; (3) to eliminate the prior test of whether the acquisition might restrain commerce 'in any * * * community' and instead, to make the test whether 'in any line of commerce in any section of the country' the acquisition may substantially lessen competition, or tend to create a monopoly; and (4) to cover vertical as well as horizontal mergers.

"The Congressional reports illuminate the reasons which led to the amendment of section 7. A fair reading of both the Senate and House Committee Reports leaves no doubt as to its major objectives. As stated in those Reports they were, in some instances in hæc verba, (1) to limit future increases in the level of economic concentration resulting from corporate mergers and acquisitions; (2) to meet the threat posed by the merger movement to small business fields and thereby aid in preserving small business as an important competitive factor in the American economy; (3) to cope with monopolistic tendencies in their incipiency and before they attain Sherman Act proportions; and (4) to avoid a Sherman Act test in deciding the effects of a merger."

This court accepts the legislative history as found in Judge Weinfeld's opinion, and incorporates it as a part of this decision.

I—*Discussion of the issues.*

It is safe to say at the outset that in this case the main area of dispute between the parties is whether there has been competition between Koppers and Thomas in the production and sale of their metal flexible couplings. John M. Crimmins, Esq., chief counsel for the defendants was frank to say at the oral argument that in determining the line of commerce the court must find its decision " * * * based on the actualities of the market place. * * * That's competition. Actual competition. Actual competition in sales at the time of the acquisition." He stated further, "If these companies worked in substantial competition at the time of the purchase, then our case fails. The turning point is the amount of competition between Koppers and Thomas at the time that we acquired Thomas." Contrary to the

government's contention that the line of commerce is flexible couplings, defendants contend that the flexible coupling industry must be subdivided into several lines of commerce. They say that Thomas, the sole manufacturer of metal disc couplings, is engaged in one line of commerce; that Koppers, in the manufacture and sale of its gear type flexible couplings is in another and separate line of commerce.

It is the government's position that the merger in this case is a horizontal acquisition. It refers to the House Report in which the three types of acquisition are defined. Horizontal acquisitions are those in which the firms involved are engaged in roughly similar lines of endeavor; vertical acquisitions are those in which the purchase represents a movement either backward from or forward toward the ultimate consumer; and conglomerate acquisitions are those in which there is no discernible relationship in the nature of business between the acquiring and acquired firms. The defendants contend that the Thomas acquisition by Koppers is a conglomerate merger. However, all the evidence indicates that the two corporations have been engaged in roughly similar lines of endeavor. Both the Koppers and the Thomas coupling seek to accomplish the same result, that is the accommodation of misalignment. The grid, rubber, jaw and chain type flexible coupling serves the same function of connecting rotating shafts and seek the same result, although each may use a different principle to achieve its flexibility. On the evidence, this court believes there can be but one finding and that is that the flexible coupling industry is recognized as having sufficient peculiar characteristics and uses to constitute flexible couplings as products sufficiently distinct from all other products as to make them a line of commerce within the meaning of the Clayton Act. But says the defendant, this still does not control the issues in this case, because as in Bethlehem Steel, the court found the Steel industry to be a line of commerce but said certain subdivisions thereof are separate lines of commerce. I do not understand that defendants' quarrel with the government's contention that the flexible coupling industry is a line of commerce, provided that the court consider it in a broad sense, as did the court in speaking of the steel industry in the Bethlehem Steel case. But, as indicated, defendants contend that because there was no actual competition in the market place between Kopper's coupling and the Thomas coupling, each must be found under the evidence to be a separate line of commerce and therefore no violation of the statute has resulted from the merger.

In the Du Pont case, Justice Brennan, 353 U.S. at p. 593, 77 S.Ct. at p. 877, said that the "Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition.' Substantiality can be determined only in terms of the market affected."

II—*The evidence in this case shows that flexible couplings have sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all other products as to make them a line of commerce within the meaning of the Clayton Act.*

▪ All flexible couplings are not identical and most of them have quality and use differences. Yet this court finds that under the decisions and the evidence they are still sufficiently distinct from all other products as to constitute them a line of commerce. There is no disagreement whatsoever by any of the witnesses as to the function and purpose of the flexible coupling. The government introduced into evidence exhibit G–91, an article from the Engineer's Digest. As indicated, the article is headed "Flexible Couplings". The article lists the specific properties of flexible couplings as compared with a rigid arrangement, e. g., bolted, keyed, press fitted or shrunk on connections, which

can be employed without too much difficulty on comparatively short lengths of shafts running in bearings with brackets or pedestals on a common bedplate. But, says the Digest, with flexible couplings a certain amount of misalignment is permissible because the forces due to angular, radial or axial errors are either made inoperative by joints, links, pivoting or sliding action or give rise to strains which are associated with low stresses in the members of the coupling. A shorter definition of a flexible coupling can be gathered from the Engineers' Digest as an "Accommodation of Misalignment". The Digest states that it is an important point that any misalignment be absorbed by the couplings themselves, i. e., that no end thrust, side thrust, additional axial or bending vibrations, torsional vibrations, edge loads, or rubbing action be imposed on the shaft. Further, the Engineers' Digest classifies and describes flexible couplings in two basic groups. One is couplings incorporating nonmetallic components and the other is all metal couplings. Under the latter are metal disc couplings, metal spring couplings, metal brush or pin couplings, gear couplings and chain couplings. It should be noticed that under the second group, Thomas makes the metal disc coupling and Koppers the gear coupling. It is to be emphasized that the whole field of flexible couplings is encompassed in an article from the Engineers' Digest entitled "Flexible Couplings".

The evidence by the witnesses in the industry shows that the gear, disc, rubber, jaw and chain type flexible couplings are all regarded as products of a general classification, that is flexible couplings. For instance, Mr. Gibson, Purchasing Agent for the Worthington Pump Co. was called as a witness by the defendants and said (Tr. 344)

"  *  *  *  we code all of our purchases,  *  *  *  Couplings are so specified as couplings, and then we also break that down further as to the manufacturer or the type of coupling."

This witness regarded flexible couplings in the broad category of couplings. The item he buys in the first instance is regarded as a flexible coupling. It is safe to say from this witness's testimony that to him and his company flexible couplings have sufficient individual peculiarities as to be isolated or separated under one heading, "Couplings". Thus, under the evidence in this case, it seems to this court that the manufacture and sale of all flexible couplings in the United States is a line of commerce. But the finding that a flexible coupling industry is a distinct line of commerce standing alone is insufficient in which to find a violation of the statute.

As indicated in the Du Pont case, there must be a determination of the relevant market to predicate a finding of a violation, because the threatened monopoly must be one which will substantially lessen competition within the area of affected competition. Substantiality can be determined only in the terms of the market affected. The market in this case is the market for flexible couplings throughout the United States. It is stipulated that the section of the country is the whole United States as both corporations do business in interstate commerce and sell nationwide. Thus we are down to the basic issue as contended by the defendants, that is, that there is and has been no substantial competition between Koppers and Thomas in the sale of their couplings, and that therefore the acquisition is lawful.

At this point in the discussion it is believed that a word of explanation as to the method of decision is in order. At the conclusion of the trial of this case, as trial Judge, I had a strong impression that the government had shown by a preponderance of the evidence that the merger was in violation of Section 7. During the trial the government put into evidence some 99 exhibits and offered the testimony of 6 witnesses. The defendants introduced 20 exhibits and put 8 witnesses on the stand. As the exhibits were introduced, they were ex-

amined and considered in relation to the purpose for which they were offered. Likewise, the oral testimony was considered in relation to the issues in the case. Because of pretrial conferences, this court believes that it was fairly conversant with the issues during the trial. As indicated, I have now decided that the government is to prevail. The decision, however, was not made until after oral argument and a study of the final briefs. Counsel on both sides have been most careful and exceedingly helpful in the preparation of briefs and especially in the proposed findings which each requests the court to make. But as the case is to be decided in favor of the government, it necessarily follows that the government's proposed findings are the ones which the court accepts. This is not because it is a convenient method of deciding a case but because this court is convinced that the findings submitted by the government are based upon credible persuasive evidence of almost overwhelming probative value. It necessarily follows of course that the proposed findings submitted by defendants are rejected. It is to be noticed, however, that proposed finding 11, as submitted by defendants, has been agreed to and will be substituted and will stand in lieu of the government's proposed finding 6.

In the remaining discussion of the issues and the evidence, I have not attempted to refer to all the exhibits nor to quote or refer to everything said by all the witnesses. References, however, will be made to some of the exhibits and to some of the testimony, which in the mind of the court is persuasive.

■ It is appropriate to point to the government's evidence which in the opinion of this court compels the finding that the government has proved by a fair preponderance of the evidence, a violation of the statute.

III—*The market affected is substantial.*

In 1960 the sales of all types of flexible couplings amounted to nearly $29,400,000. In that year Koppers sold flexible couplings in the amount of $6,739,721. Thomas sold flexible couplings in the amount of $1,715,048. Koppers' sales of flexible couplings in 1960 alone amounted to 23% of the total. Thomas' sales in 1960 amounted to 5.8% of the total. The combined Koppers-Thomas sales amounted to $8,454,769, which was 28.8% of the total sales in flexible couplings in 1960. In the detailed findings of fact which appear, infra, the figures for 1958 and 1959 are comparable. It is understood also that as to the market and the substantiality, defendants raise no issue.

Thomas has been a profitable company averaging profits in excess of $100,000.00 per year during the period of 1955 through 1959. Koppers is one of the five largest manufacturing companies in the United States with sales in excess of $300,000,000. Koppers is the largest manufacturer of flexible couplings in the United States but Thomas is the largest exclusive manufacturer of flexible couplings in the country, as it is the largest firm in the United States manufacturing only flexible couplings. Thomas is highly regarded in the industry and has a well established market. The history of this company is not unlike the history of many other of the smaller business establishments in the country. The business was founded by Millward T. Thomas, now deceased, who owned and operated it successfully for many years. On the death of Mr. Thomas, his successors in ownership were agreeable to a sale, and the transaction with Koppers was completed in early 1961. There is no controversy between these parties but that the relevant market for the purpose of this case is coextensive with the flexible coupling market in the United States, which in turn is nationwide. It is believed also that there is no serious controversy but that each of the defendants prior to the merger had a substantial part of that market. The chart at p. 27 of exhibit G–90 illustrates this fact. The Koppers and Thomas' combined sales came to 28.8% of the total in the country. The next 18 companies had 65.7% of the sales,

leaving 41 companies with 5.5% of the sales, equaling $1,630,875.

IV—*Prior to the merger, there was substantial competition between Koppers and Thomas.*

■ The foregoing is a statement of the crux of the case. The government has pointed its proof in support of that proposition. The defendants have attempted to show that the statement is incorrect. The court has not overlooked what was emphasized in both the Bethlehem Steel and the Brown Shoe case as to the effect of the 1950 amendment of the act. The act previously required a substantial lessening of competition between the acquiring and the acquired corporations and narrowed the restraint to any section or community. However, it now prohibits (a) any acquisition of stock or assets (b) in any line of commerce (c) in any section of the country (d) where the effect may be substantially to lessen competition or tend to create a monopoly.

No doubt, in many of the anti-merger cases found in the books, the issue of competition between the acquiring and acquired corporations has not been so decisive as it is in this case. But this court is deciding the issues presented in this case only. Here the extent of the competition between Koppers and Thomas determines the decision because it follows that if that competition was substantial then the merger has lessened competition in a line of commerce throughout the United States.

The court agrees with defendants' statement that the decision as to whether the couplings compete in the same or different lines of commerce involves both legal and factual questions. This court has not overlooked defendants' contention that the various tests evolved by the courts look to (1) the physical and functional characteristics of the products, (2) the existence of price competition between the products, (3) the degree of interchangeability existing between the products and (4) the attitude and actions of the buying public.

Mr. Crimmins, for the defendants, points to the undoubted fact that the physical characteristics of the Koppers and Thomas couplings are not the same but different. It is true that the witnesses recognized that these couplings are physically distinguishable one from the other. This fact becomes apparent from a mere glance at the catalogues as well as at the couplings themselves which were offered into evidence. There is no dispute also that the two couplings function differently in achieving their flexibility. The gear type coupling permits flexibility by virtue of the clearance between the gear teeth on the hub and sleeve of the coupling. The disc type coupling achieves its flexibility through the bending of the metal discs which are an integral part of the coupling. Defendants say that the differences between the two couplings are important since it is a result of these differences that the two types of couplings do not compete for the same consumer dealer.

Under (2) defendants declare that there is no actual price competition between the two products, and assert that the government has failed to adduce any evidence indicating that a change in the price of one type of coupling results in an increase or decrease in the sales of the other type of coupling. Defendants point to the testimony of Mr. Zurn on this point. This witness markets a gear type coupling which, he claims, is in competition with both the Koppers and Thomas couplings. He indicated in his testimony that it was only in very small sizes where the volume is high that price becomes important. It is true also that three of defendants' witnesses testified that the purchasing of the couplings was governed largely by engineering requirements. The conclusion which the defendants draw is that there is no sensitivity to price change in the purchasing of the two types of couplings, and that therefore there is no cross elasticity of demand with relation to the market of the two products.

Defendants next (3) assert that the two couplings are functionally not inter-

changeable. This was an important point in United States v. E. I. Du Pont, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (the cellophane case). This principal of lack of interchangeability is strongly emphasized by defendants as controlling on the issue of competition between Koppers and Thomas prior to the merger. In the language of the cellophane case, say the defendants, this court must decide whether the Fast gear type coupling and the Thomas disc type coupling are, " * * * reasonably interchangeable by consumers for the same purposes." It is conceded that the Thomas disc type coupling requires no lubrication and the Koppers gear type coupling does require lubrication. As a result, unquestionably there are applications where non-lubrication is a necessity and the Koppers coupling cannot be used. At p. 12 of the Thomas catalogue, exhibit G–92, a non-lubricating coupling is shown on two installations, the first being on a turbine and the second being on a centrifugal pump. It is conceded that in areas where high levels of oxygen are present couplings must be of the disc type because of the humidity conditions at all times. Defendants contend also on this issue that the Thomas coupling is free of backlash whereas the Fast coupling has backlash. However, the evidence seems to the court to be inconclusive on this subject except that in some areas particularly those mentioned by Mr. Cammen of the Ingersoll-Rand Company, the Thomas coupling is preferable in applications involving reciprocating equipment. Much testimony also was introduced on the issue of vibration in the various types of couplings on the market as well as the speed of the rotating shaft as requiring one or the other coupling, and whether Thomas had most of the market in sales to diesel engine manufacturers. As to the latter, defendant contends that Thomas sales to diesel manufacturers represents a substantial share of its business but the court notices that in 1960 the total came to $119,626.00 out of a gross total of $1,715,048, which is not too persuasive on the issue of substantiality.

Under (4), that is the test being as to the attitude and actions of the buying public, defendants contend that whether products belong in the same or relevant markets is whether or not the industry itself recognizes the products involved as being different products or the same product. See United States v. Brown Shoe Company, supra. It is, of course, correct to say at the outset on this proposition that the discussion is to be confined to the flexible coupling industry and its specialized buyers, mostly original equipment manufacturers.

Defendants' contention in this respect boils down to the proposition that the buyers choice as to the coupling he uses is made by a trained engineer. Presumably such an engineer is only guided by the engineering requirements of an installation scientifically reviewed and uninfluenced by any other factors. If that principle is accepted as an established fact by the evidence in this case, then the government's case fails, but the court believes that the evidence shows that the engineers' choice is but one element to be considered by the buyers in purchasing one or the other of the number of couplings on the market. For instance, government witnesses, Zurn, Ricketts and Miller, represent the manufacturers of couplings which they contend compete with both Koppers and Thomas. They sold to many of the same customers. They were not engineers. Witnesses testified that in many installations, either a Fast coupling, Thomas or some other coupling could all do the job required. For instance, Mr. Gibson, the Worthington representative (Tr. 346) in speaking of a high starting torque indicated that both the gear type coupling and the disc type coupling were satisfactory. On many rotating shafts both a Fast and a Thomas coupling were used, one on one end and one on the other.

As to defendants' contentions just reviewed, (1), (2), (3) and (4), the government answers in its reply brief by calling

attention to the fact that many of the propositions as stated were tests evolved under, and applicable to, Sherman Act cases. Moreover, this court observes that the tests mentioned are product tests only. It does not appear that the various tests which defendants claim are controlling have application to the facts in the instant case. If it is felt, however, that they do have a substantial bearing upon the issues in this case, then the evidence shows that (2), (3) and (4) as stated by defendants, do not detract from the government's contentions but in fact support them.

As to the competition between the couplings, this court believes that the evidence in this case is practically conclusive that it is only in the sizes under $1\frac{1}{4}''$ in diameter and in areas where no lubrication is required that the Fast and Thomas couplings do not compete. But the evidence shows that the bulk of Thomas sales is in the other sizes where competition exists. Also, it is shown that there is practically no installation of a gear type coupling where a Thomas coupling will not do the job. As a general proposition defendants contend that the testimony of the government witnesses has about the same probative value as does the documentary evidence which they rely upon. Defendants assert that the government's witnesses advanced merely opinions as to the amount of competition between gear type and disc type couplings. Defendants claim that not one of the government witnesses made any factual study of the amount of real competition between these couplings. Stress is laid by defendants on the fact that not one of the government witnesses knew what Thomas' 1960 sales were, and that, says defendants, without knowing what the sales figures were, these witnesses were in no position to evaluate the amount of Thomas' sales that were in actual competition with them, that is Thomas competitors.

Defendants relied to a great extent upon the testimony of Mr. G. W. Werner, Vice President of Thomas, who had made a detailed analysis of the 1960 sales of the Thomas Company, and came to the conclusion that 82.17% of Thomas' totals were non-competitive with the Fast coupling sales. Defendants conceded that 8.19% of the total of Thomas sales in 1960 were in competition with the Koppers coupling. But taking defendants' percentages as testified to by Mr. Werner, it seems that 8.0% to 9.0% is a substantial figure in discussing the issue of the lessening of competition.

This brings the discussion to a point where it is important to consider what Congress meant when it used the word competition in the statute, especially, that is where section 7 says, " * * * the effect of such acquisition may be substantially to lessen competition." Judge Weinfeld in the Bethlehem Steel case points out (168 F.Supp. p. 588) that the House Committee Report states section 7 is intended to apply when the effect of an acquisition may be a significant reduction in the *vigor of competition.* He says also that the section 7 market may not necessarily be the same as the economist's concept of market. He says that the "line of commerce" signifies a product market and "section of the country" refers to a geographical market. Judge Weinfeld says further, a horizontal merger can effect the competition in at least two ways. It can have an impact not only on the competitors of the merged companies but also on the buyers who must rely upon the merged companies and their competitors as sources of supply. He says further, (168 F.Supp. p. 592),

> "Competition is not just rivalry among sellers. It is rivalry for the custom of buyers."

What Judge Weinfeld has said concerning competition and its meaning in a Section 7 case is illustrative of the broad inclusiveness with which it is believed the word was used by Congress in this statute. The defendants would confine it to a statistical analysis of the market place only. That is shown by Mr. Crimmins' language, " * * * by the actualities of the market place." The word competition is using language " * * * so clear and unambiguous as to leave no room for con-

struction." (Judge Maris in Transamerica Corp. v. Board of Governors, 206 F.2d 163 (3 Cir., 1953).) But nevertheless, it is believed that one is privileged to look to a dictionary for the ordinary and usual definition. Webster's Dictionary says it is:

"* * * the act of competing, especially of seeking or endeavoring to gain what another is endeavoring to gain at the same time; common strife for the same object; strife for superiority."

Under a synonym it is stated in Webster,

"Competition implies a struggle or contest between two or more persons for the same object."

Webster refers to the adage, "Competition is the life of trade."

It seems to this court that the latter phrase is a cogent expression of the will of Congress as shown by the Legislative History. Competition is to be kept alive. It is used in the statute in a broad and inclusive sense. It embraces the everyday strife and struggle between and among competitors for business. Competition has been the driving force in producing our tremendous economic strength. It is industry's great challenge—a challenge to develop new processes, new inventions, managerial techniques and new ways to increase the productivity of labor. The record made by management of both Koppers and Thomas people before the merger showed that they considered themselves competing with one another and with the other manufacturers of flexible couplings. The government exhibits illustrate words and actions of Koppers and Thomas people prior to the time the law suit was brought. Exhibits G–9 through G–42, G–44 through G–46, G–50 through G–56, G–58 through G–64 and G–80 through G–83, which came from the Koppers records refer to Thomas as a competing company or to the Thomas coupling as a coupling competing with the Fast coupling. Exhibits G–47, G–48, G–56, G–57 and G–65, from the Thomas files indicate that Thomas regards Koppers as being competitive. Especially to be noticed is exhibit G–65 written October 21, 1960, by Mr. G. C. Werner, the executive head of Thomas. He is writing to a manufacturer. He says:

"We cannot recall a single government agency or large commercial agency which has refused to accept gear type and Thomas couplings as basically equal. It is freely admitted that there are biased customers who will write us out of their request for bids. We add just as quickly that there are customers who write out the gear type coupling by simply stating 'all metal non-lubricated' to exclude the gear type."

That letter comes from the highest authority in the Thomas Flexible Coupling Company at the time it was written. He is the witness on whom the defendants rely as showing lack of competition between the two companies.

A letter from the Koppers file, exhibit G–1, was written by T. W. Chase, head of Koppers Coupling Department at Baltimore, to the Koppers Sales Manager. The writer suggests opening negotiations with Thomas for the purchase of the Thomas Flexible Coupling Company. He points out that Koppers' Los Angeles agent cited four sizable customers, all of whom were familiar with the Fast coupling but were now specifying the Thomas units. He says:

"Southern California Edison and Tidewater Oil Company were two of these. The General Purchasing agent of Ingersoll-Rand told me personally that more and more people are specifying Thomas couplings and that we are being hurt on our position with them."

The letter points out that Mr. Millward T. Thomas, the President of his company,

"* * * has practically single-, handedly created a market better than 25% as good as we have done and with many of his items at price levels in excess of ours."

He further says,

"*I shudder to think what the results will be if one of our competitors or any other organization with foresight and a capable sales team could do in the industry if they owned the Thomas Company.*" (Emphasis supplied.)

One can infer what caused Mr. Chase to shudder when he thought about the Thomas Flexible Coupling Company. He recognized the competition of Thomas. He was worried as to what energetic management in Thomas might accomplish. He did not intend to let a competitor acquire Thomas.

Government Exhibit G–90 is designated as plaintiff's chart book. Ordinarily this court examines such an exhibit with considerable reluctance. Charts and statistics have but little life and credibility as a general proposition. Nevertheless, exhibit G–90, in this court's opinion is revealing and persuasive as evidence in support of the government's contentions in this case. For instance, commencing at page 31 and running through 37, inclusive, are a list of some 195 common customers during 1958, 1959 and 1960 of Thomas and of Koppers showing the net dollar sales for those three years. The chart on page 30 illustrates the value of the common customer sales in thousands of dollars. In 1958, 77.0% of the Thomas sales were to customers who bought both Koppers and Thomas couplings. In that same year 44.0% of Koppers sales were to common customers. In 1959 Thomas had 69.0% and Koppers 38.0% of the sales to the same customers. In 1960 Thomas sales to common customers was 73.0% and Koppers sales to common customers was 48.0% of its total. It is in the evidence that the coupling sizes commenced at ¼" in diameter and ran in some instances as high as 28", but it is not disputed that the main bulk of the flexible coupling business is in diameter sizes between ¼" and 8". Some sales are smaller and some larger. Pages 42 and 43 of exhibit G–90 show an analysis of coupling sales of Koppers and Thomas in the various sizes.

Unquestionably in the smaller sizes up to ¾" Thomas had practically the field to itself. Yet the 1" through 7½" in diameter couplings accounts for the bulk of each of the defendants' business. As exhibit G–39 shows, in the sizes 1½" to 7", Koppers had 82.6% of its sales and Thomas had 84.9% of its sales. In the same sizes on a unit basis, 94.9% of Koppers is in the 1½" to 7" sizes and 64.6% of Thomas sales are in the same sizes.

Thus it appears conclusive that the substantial portion of the business of both Koppers and Thomas was not only to the same common customers but in the same size couplings, and that in a substantial market area one coupling will do the same job as the other will do.

V—*The effect of Koppers' acquisition of the Thomas stock is to substantially lessen competition in the sale of flexible couplings throughout the United States.*

This proposition seems to be self evident from what has been said and what is shown with more particularity in the detailed findings of fact. Koppers has increased its percentage of the market from 23.0% to 28.8%. Thomas has been eliminated as a substantial competitor and the competition heretofore existing between them has been destroyed. Unquestionably, the ability of smaller manufacturers to compete with the combined Koppers-Thomas Company has been substantially lessened. Koppers already dominant position in the industry has been enhanced by obtaining Thomas customer lists which competitors do not have. The $300,000,000 resources of Koppers permit more money for research and development and Koppers can utilize its own personnel in its sales force with comparatively little added expense and with major savings in commissions, all to the detriment of competing manufacturers. The government's last exhibit, that is G–99, illustrates one dominant advantage Koppers now has over its competitors in the marketing of flexible couplings. This exhibit is Koppers own advertisement put out after the merger. After mentioning the three couplings

that Thomas now produces, this advertisement emphasizes that:

"Of considerable importance are the experienced extensive engineering and manufacturing services of the entire Koppers organization that are available to help you with your power transmission problems * * in any size, in any quantity, for any use."

It thus appears that one effect of this acquisition, as feared by some of the smaller competitors, has been realized. That is that the entire engineering and manufacturing services of the Koppers organization is now available in the industry for not only the Fast coupling but to promote the Thomas coupling as well. Such a result inevitably will squeeze the smaller manufacturers. The total effect of the merger will certainly tend to lessen competition in the coupling industry.

In this case the government has had the burden of proof and has met it with convincing and persuasive evidence. By a clear preponderance of the evidence the government has shown that the acquisition was in violation of Section 7 of the Clayton Act.

The findings of fact and conclusions of law which follow are part of this adjudication and an appropriate order will be entered on notice to counsel and submission by the government.

## FINDINGS OF FACT

### I—*Preliminary jurisdiction*

1. Defendant, Koppers Company, Inc., hereinafter referred to as "Koppers", is a corporation organized and existing under the laws of the State of Delaware, with its principal office in Pittsburgh, Pennsylvania.

2. Koppers is a highly diversified organization with total sales in 1960 in excess of $300 million. It conducts its business through eight operating divisions, one of which is its Metal Products Division. The Metal Products Division is in turn segmented into various departments one of which is the Coupling Department which manufactures and sells flexible couplings from its plant in Baltimore, Maryland. These couplings are sold and shipped throughout the United States in interstate commerce.

3. Thomas Flexible Coupling Company, hereinafter referred to as "Thomas", is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal office in Warren, Pennsylvania.

4. Thomas flexible couplings are manufactured in Warren, Pennsylvania and are sold and shipped throughout the United States in interstate commerce.

5. On February 17, 1961 the Justice Department filed suit against Koppers and Thomas charging a violation of Section 7 of the Clayton Act as a result of the acquisition by Koppers of substantially all the stock of Thomas. The acquisition was accomplished on January 3, 1961 by means of a stock exchange, with 1⅔d shares of Koppers' stock exchanged for each share of Thomas stock.

### II—*Nature of the industry*

6. Metal flexible couplings manufactured and sold by both Koppers and Thomas are used for the general purposes of transmitting power by joining together rotating shafts. They serve three functions: (1) Couple shafts for mechanical power transmission, transferring the torque of one shaft to the other, directly and with constant velocity. (2) Compensate for all types of misalignment between shafts without inducing stresses and loads on the connected equipment and without a tangible loss of power. (3) Compensate for end or axial movement of the coupled shafts, preventing either shaft from exerting a thrust on the other and allowing each to rotate on its normal axial position.

7. There are various types of flexible couplings such as gear, disc, grid, rubber, jaw and chain each of which serves the function of connecting rotating shafts, transmitting power from the driving to the driven member and while so doing

compensating for minor degrees of misalignment although each may use a different principle to achieve its flexibility.

8. Koppers manufactures and sells gear type flexible couplings under its trade name of "Fast's" which is used to connect rotating shafts, transmit power from the driving to the driven member and while so doing compensates for minor degrees of misalignment.

9. Thomas manufactures and sells a disc type flexible coupling which is used to connect rotating shafts, transmit power from the driving to the driven member and while so doing compensates for minor degrees of misalignment.

10. The formula used by all flexible coupling manufacturers including Koppers and Thomas to determine the size of the coupling to be used is:

$$\frac{H\ P}{RPM} \times 100 \times \text{Service Factor} =$$

load requirement

11. Among the principal firms manufacturing and selling flexible couplings are:

Koppers Company, Inc.
Thomas Flexible Coupling Company
Zurn Industries, Inc.
Poole Foundry and Machine Company
Sier Bath Gear & Pump Company
The Falk Corporation
Waldron Hartig Division of Midland Ross Corp.
Dodge Manufacturing Corporation
Lovejoy Flexible Coupling Company, Inc.
Ajax Flexible Coupling Company
Philadelphia Gear Corporation
Link Belt Company

12. The principal sales of flexible couplings are made to large commercial users of machinery and original equipment manufacturers. Sales are made by means of salaried sales personnel, by distributors, or by sales representatives operating on commission.

13. Total sales of all types of flexible couplings for each of the years 1958,

1959 and 1960 were as follows (rounded figures):

| | |
|---|---|
| 1958 | $23,500,000 |
| 1959 | 28,200,000 |
| 1960 | 29,400,000 |

III—*Relevant market*

14. The following firms are considered by Koppers to be companies competitive with the coupling department of the Metal Products Division.

Ajax Flexible Coupling Co., Inc.—Westfield, New York

Poole Foundry & Machine Company—Baltimore, Maryland

John Waldron Corporation—New Brunswick, N. J.

American Flexible Coupling Co.—Erie Pennsylvania (Zurn Industries, Inc.)

Philadelphia Gear Works, Inc.—Philadelphia, Pa.

Falk Corporation—Milwaukee, Wisconsin

Sier-Bath Gear & Pump Co., Inc.—North Bergen, N. J.

Thomas Flexible Coupling Co.—Warren, Pa.

T. B. Woods Sons Co.—Chambersburg, Pa.

Morse Chain Co.—Ithaca, New York

Link Belt Company—Chicago, Illinois

15. Koppers ran technical tests to compare the characteristics of competing couplings and the tests included Falk, Zurn (Amerigear) and Thomas.

16. Monthly reports submitted by Koppers' District Managers prior to the acquisition of Thomas by Koppers consistently referred to the competitive activities of Thomas agents.

17. In July, 1958 one of Koppers district managers reported:

Have received a trial order from Barkelew Electric Middletown, for #1 Model B on a rotary switch application. They are presently using Thomas Couplings for this.

18. In February, 1959 Koppers Western District manager reported:

Union Oil—Los Angeles

Contact made in down town central office (Union Oil Center) persons contacted R. X. Bungay, Engineer in Charge of new construction and Paul Grandell, assistant to Bungay. Key buying influence is Mr. Leroy Keller at Wilmington Refinery and he wants Thomas. All attemps (sic) to change this opinion have been thwarted.

19. In April, 1959 Koppers' Manager reported:

W. A. Hoppe, local Thomas agent, has been into Pacific Pumps crowing about Stanvac Philippines. However, he got a jolt when he learned about Petrobras job. This man is a real bearer and has been in our hair for some years.

20. In September, 1959 the following report was made by Koppers Sales personnel:

Competitive Activities

Sier-Bath making an effort at aircraft companies. We have crossed Sier-Bath's trail on several occasions recently at local aircraft company installations.

Thomas and Amigear have been quite active in the northwest. Engineering indoctrination of our agent representatives must be accomplished to combat inroads made by these competitors.

21. In October, 1959 the following was reported by Koppers sales manager:

Competitive Activities

Falk appeared in recent process specification for unknown customer (C. F. Braun—contractor). Thomas continuing to go after steam plants, i. e., Glendale, Burbank, etc., on a "try us" basis. Unfortunately the couplings have operated satisfactorily. We are doing all possible to upset this.

22. In December, 1959, Koppers received the following report from its Western Manager:

Business obtained at Union's Wilmington Refinery remains on a replacement basis only, and Union continues to adamantly and steadfastly specify Thomas on most drives. Specifications currently issued verify this. We are still trying, both at the refinery, where the last word is said, and at the Engineering Office at the Union Oil Center in Los Angeles, with no tangible results.

23. In January, 1960 this report was submitted to Koppers by its salesman:

Competitive Activities

Most noticeable competitive activity in Southern California has again been by Sier-Bath, who have been contacting our key accounts and others in an effort to sell our price.

Thomas is supplying cooling tower couplings to OEM's for approximately 30 to 50% of our prices. They use a hollow zinc plated, carbon steel floating shaft.

24. In April, 1960 Koppers received the following report from its manager:

Connecticut Light & Power indicated they are trying all types of couplings at Norwalk Harbor Station (Falk, Thomas, Waldron, Fast's) to get comparative field data on ease of maintenance, life factors, first cost vs. long run costs, etc.

25. In December 1960 Koppers Western District manager reported:

A. Competitive Activities: Jimmy Woodward of Pacific Pumps states that an increasing number of specifications include Amerigear and Thomas. This of course, emphasizes the importance of selling the specifier.

26. In December, 1960, just prior to the acquisition, Koppers Southwestern District Manager reported:

Review of Target Accounts

Humble Oil Corporation, Houston, Texas

Behrings Bearing Service, Inc.: Business increasing since opening new sites in Baytown. We are taking business away from Thomas. This will create a problem in 1961.

27. In April, 1960 Koppers Eastern manager made the following report:

Smith Discussed new design floating shaft for better competitive position with Falk and Thomas in pump and compressor field, with engineering in Baltimore.

28. Thomas manufactures a "floating shaft" type flexible coupling under its catalogue type SN.

29. Koppers manufactures a "floating shaft" flexible coupling.

30. In some applications using a "floating shaft", it is possible to put one type of coupling on one end and a different type of coupling on the other end.

31. On October 21, 1960 Mr. Glen Werner, Vice President in Charge of Sales and Engineering for Thomas commented on the competition between gear and disc type couplings as follows:

"We cannot recall a single government agency or large commercial agency which has refused to accept gear type and Thomas couplings as basically equal. It is freely admitted that there are biased customers who will write us out of their request for bids. We add just as quickly that there are customers who write out the gear type coupling by simply stating 'all metal non-lubricated' to exclude the gear type.

\*　\*　\*　\*　\*　\*

"Further evidence is the 'turn' of several former confirmed Gear Couplings users. In the last month we have added the names of New York's Consolidated Edison and Cincinnati Gas & Electric to the ever increasing list. This time not as specifiers on new equipment but the hard way—replacement of gear couplings which have failed. We received an order yesterday for 3 replacements for Cincinnati."

32. Competition existed between Koppers and Thomas in the sale of flexible couplings. Despite the engineering and design requirements of specific applications, there is a considerable area of overlap in which either gear or disc type couplings could be used successfully.

33. Selection of the type of coupling to be used is based on such diverse factors as price, availability, standardization within one given installation, design requirements, engineering detail, persistence of the salesman, preference expressed by the user of the machinery, reciprocity existing between the user and the coupling manufacturer, bias of the specifier of the coupling, specific problems on the application involved, and many others.

34. Specifications for flexible couplings often are worded to request a "gear type or equal", "disc type or equal", "grid type or equal" or by the name of the manufacturer i. e., "Thomas or equal", "Fast's or equal", "Falk or equal" in such cases the individual companies attempt to prove to the specifier that they are equal.

35. Representatives of the firms in the industry attempt to sell the engineers and designers of machinery on the features of his own type of couplings.

36. Prior to the acquisition, Koppers sales effort was aimed at disparaging the disc type coupling and promoting the gear type coupling manufactured by Koppers.

37. Koppers sells its gear type flexible couplings for pumps, generators and diesels.

38. Thomas sells its disc type flexible couplings for pumps, generators and diesels.

39. Lovejoy Flexible Coupling Company manufactures and sells jaw type flexible couplings for pumps, generators and diesels.

40. The Esso refinery in New Jersey used Thomas couplings and refused to use Koppers couplings while the Esso refinery in Baltimore used Koppers couplings and refused to use Thomas

couplings although the same machinery was utilized in both plants.

41. Users of flexible couplings carry the purchase in their books as flexible couplings and by manufacturer's name but not by type of coupling.

42. Thomas' price lists were obtained by Koppers salesmen while keeping abreast of competitive activities.

43. In June, 1960 Koppers' Southwestern District manager reported:

### GENERAL PRODUCT INFORMATION

Investigation into air cooler market in Tulsa, potential 500 couplings per year. We can beat Thomas prices now. This project will be covered in a special report. Couplings involved are Model B's #1½ to 2½.

44. Gear and disc type couplings are priced within the same competitive range.

45. The principal area of sales of flexible couplings ranges from bore sizes of 1½ inches to bore sizes of 7 inches.

46. In the year 1959 Thomas sales of flexible couplings in bore sizes from 1½ inch to 7 inches accounted for 84.9% of all of Thomas sales.

47. In the year 1959 Koppers sales of flexible couplings in bore sizes from 1½ inch to 7 inches accounted for 82.6% of all of Koppers' sales.

48. During the three year period, 1958, 1959 and 1960, Koppers and Thomas had 195 different companies as common customers.

49. In the year 1960, Koppers and Thomas had a total of 143 common customers.

50. Thomas sales to these common customers amounted to $1,256,767 or 73% of the total sales of Thomas for the year 1960.

51. Koppers sales of flexible couplings to these common customers in 1960 amounted to $3,234,957 or 48% of the total sales of Koppers flexible couplings in 1960.

52. All gear type flexible couplings compete.

53. Poole Foundry & Machine Company manufactures a gear type flexible coupling and is in competition with Thomas.

54. Zurn Industries manufactures a gear type flexible coupling and is in competition with Thomas.

55. Sier-Bath Gear and Pump Company manufactures a gear type flexible coupling and is in competition with Thomas.

56. The Falk Corporation makes a grid type flexible coupling and is in competition with both Thomas and gear type flexible couplings.

57. Koppers has stated that Thomas couplings are priced competitively with Sier-Bath and Falk with whom they compete.

58. Lovejoy Flexible Coupling Company manufactures a jaw type flexible coupling with a rubber resilient member between the jaws and considers its competitors to be anybody that manufactures flexible couplings.

59. In 1958 the Bureau of the Census, Department of Commerce, conducted a Census of Manufacturers. In this census the value of shipments of flexible type couplings was compiled under product code 3566323.

60. In December, 1960, in response to a request from the Department of Justice, Koppers forwarded to the Department a letter giving the sales of flexible couplings for the year 1959 as compiled by "Iron Age" magazine. That compilation combined the sales of all types of flexible couplings under one product line.

IV—*Section of the country*

61. Koppers and Thomas each have sales representatives engaged in selling flexible couplings in the principal cities of the United States.

62. It is stipulated and agreed between the parties that the proper section of the country in which to measure the effects of this acquisition is the entire United States.

V—*Effects of the acquisition*

63.  Thomas is a profitable company, averaging in excess of $100,000 per year in profits during the period 1955–1959.

64.  Koppers is one of the 500 largest manufacturing companies in the United States with sales in 1960 in excess of 300 million dollars.

65.  Thomas is the largest exclusive manufacturer of flexible couplings in the United States in that Thomas is the largest firm in the United States manufacturing only flexible couplings.

66.  Koppers is the largest manufacturer of flexible couplings in the United States.

67.  Thomas' coupling is a highly regarded coupling with a well established market.

68.  Prior to the acquisition, Thomas was a substantial active competitor in the manufacture and sale of flexible couplings.

69.  As a result of the acquisition of Thomas by Koppers, actual and potential competition between these firms has been eliminated.

70.  A survey of all flexible coupling manufacturers conducted by the Department of Justice showed that the total sales of flexible couplings in the year 1960 amounted to $29,375,519.

71.  Koppers sales of flexible couplings in 1960 amounted to $6,739,721 which comprised 23% of the total.

72.  Thomas sales of flexible couplings in 1960 amounted to $1,715,048 which comprised 5.8% of the total.

73.  The combined Koppers-Thomas total sales amounted to $8,454,769 which accounted for 28.8% of all sales of flexible couplings in 1960.

74.  Total sales of Koppers' flexible couplings for each of the years 1958, 1959 and 1960 were as follows (rounded figures):

| | |
|---|---|
| 1958 | $5,700,000 |
| 1959 | 6,100,000 |
| 1960 | 6,700,000 |

75.  Total sales of Thomas' flexible couplings for each of the years 1958, 1959 and 1960 were as follows (rounded figures):

| | |
|---|---|
| 1958 | $1,400,000 |
| 1959 | 1,400,000 |
| 1960 | 1,700,000 |

76.  In 1958 the four largest companies in the flexible coupling industry accounted for $13,839,000 or 56.5% of all flexible coupling sales.

77.  In 1958 Koppers sales of flexible couplings accounted for $5.7 million or 41.5% of the big four total, and Thomas sales of flexible couplings accounted for $1.4 million or 9.8% of the big four total.

78.  The combined Koppers-Thomas total was $7.1 million which was 51.3% of the big four total in 1958.

79.  The twenty largest companies in the flexible coupling industry in 1958 accounted for $23,281,000 or 95% of all industry sales.

80.  In 1960 the four largest companies in the flexible coupling industry accounted for $16,032,000 or 54.6% of all flexible coupling sales.

81.  In 1960 Koppers sales of flexible couplings accounted for $6.7 million or 42.0% of the big four total and Thomas sales of flexible couplings accounted for $1.7 million or 10.7% of the big four total.

82.  The combined Koppers-Thomas total was $8.4 million or 52.7% of the big four total in 1960.

83.  The twenty largest companies in the flexible coupling industry accounted for $27,745,000 or 94.5% of all industry sales in 1960.

84.  In the year 1960 the first twenty companies, or 32.8% of all flexible coupling manufacturers, had 94.5% of all flexible coupling sales. The remaining 41 companies, 67.2% of the total number of companies in the industry accounted for only 5.5% of the total sales.

85.  Of the 61 companies in the flexible coupling industry in 1960, 44 companies had coupling sales of less than $250,000

and of these, 15 sold less than $10,000 in 1960, while only .10 companies had sales in excess of $1 million.

86. Koppers was able to sell flexible couplings to Birdsboro Steel Foundry & Machine Co. on the basis of reciprocity.

87. Koppers size and position as a large purchaser enabled Koppers to obtain sales it might not otherwise obtain on the basis of reciprocity; the addition of Thomas' purchases to those of Koppers increases the opportunity to engage in reciprocity.

88. Smaller flexible coupling manufacturers, Sier-Bath, Poole, and Zurn, stated that the acquisition will add to Koppers already dominant position and make it more difficult for them to compete.

89. None of these small flexible coupling manufacturers had more than $10 million in total sales in 1960 and Poole had less than two million dollars in total sales.

90. Koppers has obtained access to Thomas' customer lists and thereby foreclosed competitors from effectively competing for this business.

91. Small companies are considering merging in order to be able to compete with the combined Koppers-Thomas Company.

92. One of the factors determining which coupling will be used is availability.

93. In February, 1960 the following report was made by Koppers salesman:

Competitive Activities

Reports received from Oliver B. Lyman Co., from Kaiser Aluminum, Trentwood, and other customers that Poole is having serious delivery problems even on small standard types.

94. Prior to the acquisition, Thomas was also a small corporation with the same inventory and delivery problems as the other small companies.

95. Thomas with Koppers' financial resources will now be able to maintain a larger inventory and thereby obtain an advantage over its smaller competitors which it did not have prior to the acquisition.

96. As a result of the acquisition, Thomas will have available the financial resources of Koppers which in 1960 had sales in excess of $300 million.

97. With Koppers' resources, Thomas will have more money for research and development, more machinery, more advertising, and more marketing to the competitive detriment of smaller flexible coupling manufacturers.

98. Prior to its acquisition by Koppers, Thomas sold its couplings primarily through agents or representatives.

99. Koppers analysis of major accounts and the areas covered by Thomas' agents showed that the major portion of the Thomas business can be handled by the Koppers sales force with comparatively little added expenses and with major savings in commissions.

100. Koppers plans to eliminate approximately 70% of Thomas' agents and replace them with existing salesmen of Koppers' Metal Products Division.

101. Koppers anticipates that as a result .of the change from Thomas' sales agents to Koppers' field sales force, they can save approximately $500,000 over the next few years.

102. Combining the Koppers' and Thomas' sales agents will substantially reduce Koppers' cost of doing business to the competitive disadvantage of its smaller rivals.

103. In addition to producing the gear type coupling under its trade name of "Fast's", Koppers also produces a rubber type coupling under the name "Holset."

104. In light of the physical differences between couplings some are more suitable for special applications than others. By acquiring Thomas, Koppers now has three principal types of flexible couplings available.

105. Since the acquisition, Koppers is able to offer three different types of couplings with the result that if a customer prefers a disc type rather than a gear type, Koppers will be able to still make that sale.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the defendants Koppers Company, Inc., a corporation and over Thomas Flexible Coupling Company, Inc., a corporation, in this pending civil action.

2. The acquisition of the stock of Thomas by Koppers is within the contemplation of Section 7 of the Clayton Act.

3. The line of commerce involved in this acquisition is manufacture and sale of flexible couplings as a whole.

4. The section of the country in which to test this acquisition is the entire United States.

5. Acquisition of the stock of Thomas by Koppers will substantially lessen competition or tend to create a monopoly in the manufacture and sale of flexible couplings.

6. The acquisition of the stock of Thomas by Koppers violates Section 7 of the Clayton Act.

7. Further hearings, if necessary, will be conducted by the court to determine the appropriate relief to be granted.