**UNITED STATES of America, Plaintiff,**

v.

**PENNZOIL COMPANY and Kendall Refining Company, Defendants.**

**Civ. A. No. 65–838.**

United States District Court

W. D. Pennsylvania.

Dec. 30, 1965.

John H. Waters, Dept. of Justice, Washington, D. C., for plaintiff.

Victor H. Kramer, Arnold, Fortas & Porter, Washington, D. C., for defendants.

ROSENBERG, District Judge.

The United States of America, plaintiff, brings this action for injunctive relief against Pennzoil Company and Kendall Refining Company, defendants, as based upon the provisions contained in § 7 of the Clayton Act (Act of Congress of October 15, 1914, c. 323, § 7, 38 Stat. 731, December 29, 1950, c. 1184, 64 Stat. 1125, 15 U.S.C. § 18) [1]

The action was filed on August 4, 1965 to enjoin the consummation of an acquisition agreement of Kendall by Pennzoil on the basis that it violated § 7 of the Clayton Act. As originally filed, the complaint requested a temporary restraining order, but after a short hearing, the parties entered into a stipulation whereby the defendants agreed not to consummate the agreement until after a ruling on the plaintiff's motion for preliminary injunction.

In its complaint, the Government averred that the defendants, Pennzoil and Kendall, producers of Penn Grade crude oil and refiners of that product, entered into an agreement dated June 11, 1965, whereby Pennzoil was to succeed to all the rights, properties and assets of Kendall by exchanging Kendall common stock for newly issued Pennzoil cumulative convertible preferred stock. The complaint charged that actual and potential competition between these two corporations in the purchase of Penn Grade would be eliminated; that Kendall would be eliminated as a substantial competitive factor in the purchase of Penn Grade; and, that concentration in the production and purchasing of Penn Grade will be substantially increased.

A hearing on the motion for preliminary injunction was commenced on September 14th and concluded on September 21st. Considerable testimony was taken and a large number of exhibits were presented by the parties. The question is whether or not the plaintiff has met its burden of proving that a preliminary injunction should issue on a violation of § 7 of the Clayton Act.

The plaintiff contends that the consummation of the proposed merger of Pennzoil and Kendall would be an acquisition in a line of commerce (Pennsylvania Grade crude oil) in a section of the country delineated by boundaries of the Pennsylvania Grade crude oil producing area, the effect of which may be to substantially lessen competition or tend to create a monopoly, and that such acquisition is forbidden by § 7 of the Clayton Act.

The defendants, on the other hand, contend that

(1) the plaintiff cannot prevail at a trial on the merits because the evidence established that Pennsylvania Grade crude is not a line of commerce within the meaning of the Clayton Act;

(2) the merger will not substantially lessen competition even if it is assumed, *arguendo*, that Penn Grade crude oil is a line of commerce within the meaning of the Act;

(3) the merger will not violate § 7 of the Act because it will promote, not lessen competition;

(4) the issuance of a preliminary injunction would inflict irreparable injury on the defendants and amount to a final judgment for the plaintiff; and

(5) even if the plaintiff should ultimately prevail in a trial on the merits, divestiture would be a completely adequate remedy.

Pennsylvania Grade crude oil is extracted from fields known as the oldest commercial oil producing area in the world. The fields are located on the western side of the Appalachian Basin

---

1. The pertinent part is as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

within a definite area located in southwestern New York, western Pennsylvania, eastern Ohio, and all of West Virginia. The crude oil extracted from this Basin has been and is known as Penn Grade crude, and that term is commonly applied to it in all aspects of its commerce. This crude is generally located in and produced from the Ordovician stratum [2] of the earth's formation, generally found at depths varying from 1500 feet in Pennsylvania to 3500 feet in West Virginia.

Penn Grade crude is extracted by more than 2,000 independent producers operating approximately 100,000 wells with an average daily output of less than one-third barrel per day. The producers include the two defendants, Pennzoil and Kendall, who are also refiners, as well as the third producer-refiner, Quaker State Refining Company. In the past seven or eight years the total annual production of Penn Grade crude has ranged from eleven to twelve million barrels. The largest producer is the defendant Pennzoil with a rated production in 1964 of 25% of the total. In the same year defendant Kendall had a rated production of approximately 3%, as did Quaker State Refining Company. The remaining 68.5% or about 8,200,000 barrels was produced by the independents who are neither refiners nor processors of the crude oil.

The production of Penn Grade crude is, on the whole, by extraction induced by mechanically forced pumping. The reserves or deposits have been subjected to a series of secondary recovery techniques, and currently efforts to increase recoverable reserves are being made with the use of hydraulic fracturing and steam injection.[3]

Penn Grade crude is distinctive because paraffin comparatively free from impurities forms its major base component, while other crudes have either an asphaltic base or a mixed asphaltic-paraffin base. Because of its paraffin base and its relative freedom from asphalt, carbon and sulphur, Penn Grade crude is easier to refine than are other crude oils. The peculiar chemical composition of Penn Grade crude permits its refiners to omit certain steps which are necessary in the refining of other types of crude oil. Penn Grade crude has been distinctly, easily and exclusively processable into the highest grade of lubricants available. Its composition and lubricant yield of 25% is so distinct as to make it usable for lubrication of certain kinds of large machinery without any processing whatsoever. This, however, is not considered to be its end use. Its primary distinction lies in the fact that it is easily convertible into the highest quality of lubricants obtainable.

Penn Grade crude has in the past been processed in a large number of refineries. These have dwindled to ten refineries, four of which are presently owned by the defendants, Pennzoil and Kendall. Pennzoil operates three and Kendall operates one. Quaker State Refining Company also operates three refineries. All ten refineries are relatively small, with through-put capacity ranging from 1,000 to 10,000 barrels per day. They are principally lubricant plants specially built to utilize this particular grade of crude oil. This is so because Penn Grade crude refiners produce lubricants primarily, with gasoline and other incidentals as side products, as opposed to other crude refiners which produce gasoline primarily, with lubricants and other incidentals as

2. The second period of geologic time in the Paleozoic era; it is characterized by small land area, limestone deposits, primitive vertebrates, and many marine invertebrates. Standard American Encyclopedia, 1940.

3. Hydraulic fracturing—fluid impregnated with sand is pumped into a well at an extremely high pressure causing rocks to split; the sand contained in the fluid keeps the crack open for greater and easier oil accumulation.

Steam injection—modification of hydraulic fracturing procedure utilizing steam rather than fluid.

side products.[4] All ten refineries for this Penn Grade crude product are located in the Penn Grade crude producing area. So it is that Penn Grade crude is transported only within this geographic section of the country and it is processed exclusively in these refineries.

In order to supplement their own production of Penn Grade crude in 1964, the defendants Pennzoil and Kendall and Quaker State purchased substantial quantities from the independent producers. Of the approximately eight million barrels produced by the independents in 1964, Pennzoil, Kendall and Quaker State purchased 93%. Quaker State was the largest purchaser with 3,517,000 barrels comprising 43% of the total so produced by the independents. Pennzoil was the second largest purchaser with 3,106,-515 barrels comprising 38% of the total produced by the independents. Kendall was the third largest purchaser with 995,380 barrels comprising 12% of the independents' production.

In 1964, approximately 11,580,360 barrels of Penn Grade crude were run through the ten refineries of Penn Grade crude. Pennzoil accounted for approximately 44%, Quaker State for approximately 29% and Kendall for 13%. Thus, the top three refiners accounted for approximately 86% of the refining runs of Penn Grade crude. The three small refiners ran through only 14%. Pennzoil and Kendall together accounted for 57% of the total refining runs.

The Penn Grade crude refiners have a total refining capacity of 40,320 barrels per day. Of this total, Pennzoil accounts for 40%, Quaker State for 23% and Kendall for 14%. Thus, the top three Penn Grade refiners account for approximately 77% of the total. Pennzoil and Kendall account for 54% of the total refining capacity.

The marketing of oil between the producers and refiner-purchasers is governed by short-term contracts as a general rule, and "transfer orders" which provide for delivery are generally revocable by either party upon notice. Penn Grade crude is sold by the producers at a price which is determined and posted by the refiners. This grade of crude oil commands a premium price in the market place and is currently being sold at an average price of $1.00 more per barrel than other crudes. In 1963 for example, five of the other better quality crudes in the nation ranged from $2.65 per barrel for West Texas crude to $3.15 per barrel for Texas Gulf crude. At the same time Penn Grade in the Bradford Field was priced at $4.63.

Prices vary slightly in the Penn Grade field because the crude is priced so as to arrive at Oil City at one price. The slight variations in the posted price reflect, therefore, the cost of gathering and transporting the crude oil. Delivery of the crude oil to the refiners is made at the producers' wells and it is transported to the refineries by pipelines. Where pipelines are not accessible, supplemental transportation is by tank truck pick-up.

Eureka Pipe Line Company is the only transporter of Penn Grade crude by pipeline in West Virginia. Penn Grade crude, shipped from eastern Ohio by Buckeye Pipe Line Company, is put into the pipelines of Eureka at the Ohio-West Virginia border. Eastern Ohio Penn Grade crude and West Virginia Penn Grade crude, gathered and transported by Eureka, is delivered to the two refineries which process Penn Grade crude in West Virginia (one owned by Pennzoil, the other by Quaker State); and to the extent it is not utilized there, it is transported by Eureka to the West Virginia-Pennsylvania border and there it is put into the pipeline system of National Transit Company. Pennzoil owns 52% of the common stock of Eureka.

With the exception of a small pipeline owned by Quaker State which runs from the Allegheny Field in Allegheny County, New York, to Quaker State's refinery at Farmer's Valley, McKean County, Penn-

---

4. Because of this also, the number of barrels refined per year cannot be compared to the number of barrels of other crudes refined.

**970**

sylvania, National Transit Company is the only transporter of Penn Grade crude by trunk pipeline in Pennsylvania. National Transit delivers Penn Grade crude picked up from Eureka at the West Virginia-Pennsylvania border and Penn Grade crude produced in southwestern Pennsylvania to the Oil City refining area. Pennzoil owns 91% of the common stock of National Transit, while the other 9% is owned by Kendall.

The lubricants produced by the Penn Grade refiners are distributed primarily through independent dealers and not in refiner-owned service stations. They are marketed under specific trade or brand names with insigne or labeling which identifies them as produced from "Pure Pennsylvania oil". Penn Grade crude can be found in, and recovered from, only the Penn Grade crude area comprising southwestern New York, western Pennsylvania, eastern Ohio and all of West Virginia. It is purchaseable only in this area. It is transportable only within this area. And, it is refined only in this area.

The petroleum industry regards Penn Grade crude as a separate economic entity. Both the American Petroleum Institute and the Bureau of Mines of the Department of Interior keep separate statistics on its production and the National Petroleum Refiners Association publishes a monthly statistical bulletin on Pennsylvania oils. Producers and refiners of Penn Grade crude oil are united in a trade association, the Pennsylvania Grade Crude Oil Association. The license regulations of the Penn Grade association provide that only motor oils manufactured from "100% pure Pennsylvania Grade crude oil" may be marketed in containers bearing the association's insigne. The term "100% Pure Pennsylvania oil", used in advertising Penn Grade lubricants, refers to oil produced within the geographic area commonly recognized as the Pennsylvania oil region.

Penn Grade crude has been the object of emulation and refiners throughout the country during the past thirty years have striven to obtain equality with the specifications of Penn Grade crude lubricants. In this connection, scientific knowledge and improved technology has added much to the improvement of the specifications of "lube" products obtained from other crudes. Today there is a claim by the major oil companies that they have finally succeeded in equalling the specifications of the Penn Grade lubricants. Penn Grade crude products have achieved a reputation which is not only nationwide but worldwide; and it is noteworthy that in spite of the claim of the major oil companies that they have equalled the specifications of Penn Grade crude products, that Penn Grade crude, nevertheless, continues to demand the highest price among crude oils; continues to be more easily refined than other grade crudes; persists in having the reputation of the highest quality; and continues to be demandable by consumers because of the fact that it is derived from Pennsylvania Grade crude.

## LINE OF COMMERCE

The defendants argue that there can be no line of commerce without regard to the end use of the raw material; that the courts have consistently tested the effects of mergers in terms of the products made from, or the end use of the raw material; and, that there is no legal precedent by which Penn Grade crude as such can be considered a line of commerce within the meaning of § 7 of the Clayton Act.

■■ The last part of this argument may here be used, not as a positive but rather as a negative crutch. The mere absence of precedents does not of itself defeat a right of action. In order for a precedent to exist, there must be an antecedent case. The absence of precedents, then, is no authority against a right of action, and that circumstance does not of itself defeat a right of action. Heine v. New York Life Insurance Co., 50 F.2d 382, C.A.9, 1931. "It is well established that the mere absence of precedent does not prove that an action cannot be maintained." Daily v. Parker,

152 F.2d 174, 162 A.L.R. 819, C.A.7, 1945; Morrow v. Yannantuono, 152 Misc. 134, 273 N.Y.S. 912; Hill v. Sibley Memorial Hospital, 108 F.Supp. 739, 740 (D.C.D.C., 1952). To the same effect is Bonbrest v. Kotz, 65 F.Supp. 138 (D.C. D.C., 1946). Neither does the absence of precedents raise any presumption, ipso facto, that a plaintiff lacks a remedy.

 Because the plaintiff bases its action here on a statute, the authority by which a judicial determination may be made must appear by the command or direction of the statute, itself. We look fundamentally for our authority to the words of the statute and if necessary to the Congressional reports of the proposed statute as it was being considered by the Congress. We also look for direction from the Supreme Court as it viewed and discussed the statute in the light of the Congressional reports and as reflected in background history, necessity and purpose. From all of this we are instructed that § 7 provides a remedy where there may be a substantial lessening of competition or where there may be a tendency to create a monopoly "in any line of commerce, in any section of the country". United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Aluminum Company of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed. 2d 314 (1964); United States v. El Paso Natural Gas Company, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Brown Shoe Company v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); Maryland and Virginia Milk Producers Association v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1956); Standard Oil Company of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1948); Van Camp & Sons, Inc., v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311 (1929). We have substantial guidance in all of these decisions.

 Since § 7 forbids acquisition, in whole or in part, of the assets of one or more corporations where in any line of commerce in any section of the country the effect of such acquisition may be to substantially lessen competition or tend to create a monopoly, it is incumbent upon the plaintiff in this action to show that Pennzoil, as a defendant, seeks to acquire the assets of Kendall in a line of commerce in a section of the country, and that the effects of such acquisition may substantially lessen competition or tend to create a monopoly. This "line of commerce" in the stated "section of the country" must then constitute the market which is relevant to the determination under the proscription of § 7.

 Two elements comprise a relevant market: (1) the product or subject of economic activity, and (2) the geographic area in which the economic activity exists. Brown Shoe Co. v. United States, supra. Determination of a relevant market, both as respect the product and the geographical area, is a necessary step precedent to determining whether a corporate acquisition violates this section. Crown Zellerbach Corp. v. F. T. C., 296 F.2d 800, C.A.9, 1961; United States v. E. I. duPont de Nemours & Co. et al., supra; Brown Shoe Co. v. United States, supra. The relevant market is the "area of effective competition" within which the defendants operate. Standard Oil Co. of California, supra. "[T]he problem of defining a market turns on discovering patterns of trade which are followed in practice." United States v. United Shoe Machinery Corp., D.C., 110 F.Supp. 295, 303, affirmed per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.

 The three basic issues in a § 7 proceeding are (1) line of commerce, (2) section of the country, and (3) the probable competitive impact of the merger.

 In a trial on the merits, the Government must establish by a preponderance of the evidence that there

may be a substantial lessening of competition or tendency to monopoly in any line of commerce in any section of the country "whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition." Senate Report No. 1775, 81st Cong. page 5, U.S.Code Congressional Service, 1950, p. 4293. And, as the Supreme Court stated in Van Camp & Sons Co. v. American Can Co., supra,[5] and re-stated in United States v. du Pont de Nemours, supra,[6] at page 594, n. 13, 77 S.Ct. at page 878:

> "[I]f the forbidden effect or tendency is produced in one out of all the various lines of commerce the words 'in any line of commerce' literally are satisfied."

 It is only necessary in a preliminary injunction proceeding for the plaintiff to raise substantial questions which go to the merits of the case. Thus, it is the plaintiff's burden here merely to show that a product line involved may ultimately be found to be a line of commerce.

While the selection of an entire industry as the principal line of commerce in which to assess the competitive impact of an acquisition in § 7 cases was adopted by the courts in United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (D.C. 1958), and United States v. Philadelphia National Bank, supra, the Supreme Court in Brown Shoe Co. v. United States, supra,[7] recognized that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."

At page 325, 82 S.Ct. at page 1524, it said:

> "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. * * * *"

In a petition filed with the Public Utilities Commission of West Virginia, on July 22nd, 1963, J. Hugh Liedtke, President of Pennzoil stated:

> " * * * The technical characteristics which differentiate Pennsylvania Grade crude oil from other grades of crude oil are beyond the relevant scope of this Petition, but it is deemed relevant that in general Pennsylvania Grade crude oil commands a premium price in the market place because motor oils which are refined from such crude oil have superior lubricating characteristics and are generally accepted as premium products. In general, Pennsylvania Grade crude oil is a paraffinic base crude oil while others are either mixed or asphaltic base crude oils. In addition, a barrel of Pennsylvania Grade crude oil yields approximately 23 percent lubricating oil, compared to a national average for crude oils generally of less than three percent."

As Mr. Liedtke said, Penn Grade crude is a paraffin base crude, as differentiated from other crudes, with a seven to eight times higher yield of lubricating oil than other crude oils. It has distinct prices, in that it generally sells at more than a dollar a barrel over the price of other crudes. It is produced, moves and is processed separately within its own area and as its own industry. The Government and industry recognize Penn Grade crude as a separate economic entity. And it has distinct customers in that the only purchasers are Penn Grade crude refiners. It is by such indicia that we may determine that a well-defined sub-market exists even if crude oil should naturally happen to be an entire industry.

The refiners of Penn Grade crude are in the primary business of marketing high quality lubricants, and in that business they compete to a certain extent with

---

5. 278 U.S. 245, 49 S.Ct. 112.

6. 353 U.S. 586, 77 S.Ct. 872.

7. 370 U.S. 294, 82 S.Ct. 1502.

other companies, including the so-called majors; however, the Penn Grade refiners are also in the business of acquiring the raw material, Penn Grade crude, for the manufacture of these lubricants. In this segment of their business they compete with other Penn Grade crude refiners. This is the part of their business or line of commerce with which the present proceeding is concerned. The economic framework or relevant market to be considered here, primarily, is the producers as sellers and the refiners as buyers of a product so distinguishable as to fall within the guidelines set forth in the *Brown Shoe case,* supra.

There may be other lines of commerce comprised of lubricating oils, gasoline, asphalt, and other products of crude oil; and crude oil in general in an appropriate case may constitute a line of commerce, but well-defined trade realities exist here which support Penn Grade crude as a line of commerce. Any line of commerce definition which ignores the sellers (producers) and focuses on what the buyers (refiners) do or can do is meaningless. Here the producers produce and sell Penn Grade crude. Similarly the refiners purchase and refine only Penn Grade crude. It is only within this framework, this line of commerce, that these particular competitive forces move.

■ The evidence supports the conclusion that Penn Grade crude (1) has distinct prices; (2) has distinct customers; and (3) is recognized by the industry as a separate entity from other types of crude oil.

The defendants contend that Penn Grade crude cannot be a line of commerce because the end use to which it is put is similar to the end use of other crude oils and that the end product is interchangeable or substitutable. The fact that the other crudes have improved their end-use product and have achieved in a large measure the specifications of the end-use products of Penn Grade crude, and that the other crude products are

more easily accessible because the large oil companies distribute them in their vast networks of gasoline stations throughout the country, may indicate that there is a possible interchangeability between the end-use products of Penn Grade crude and other crudes. This contention is no more acceptable here than it was in the Brown Shoe Co. v. United States, supra,[8] where it was said, 370 U.S. at page 325, 82 S.Ct. at page 1523:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined sub-markets may exist which, in themselves, constitute product markets for antitrust purposes."

In Crown Zellerbach Co. v. Federal Trade Commission, supra,[9] 296 F.2d at page 811, this was said:

"All that the Commission was required to do was to ascertain and find a product line which was sufficiently inclusive to be meaningful in terms of trade realities. * * * In the statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any'. Any line of commerce does not mean the same as the entire line of commerce, or all lines of commerce engaged in or touched upon by the acquired concern. * * *"

So also in Reynolds Metal Co. v. Federal Trade Commission, 114 U.S.App.D.C. 2, 309 F.2d 223, 1962, a finding of the Commission was affirmed to the effect that the sub-market of the production and sale of decorative aluminum foil to the florist trade was a relevant line of commerce, distinguishable from the broadest market of decorative aluminum foil. In discussing the Brown Shoe Co. case, supra,[10] the Court stated, 309 F.2d at page 226:

" * * * It is now clear that mere potential interchangeability or cross-elasticity may be insufficient to mark the

---

8. 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510.

9. 296 F.2d 800.

10. 370 U.S. 294, 82 S.Ct. 1502.

legally pertinent limits of a 'relevant line of commerce.' The 'outer limits' of a general market may be thus determined, but sharply distinct submarkets can exist within these outer limits which may henceforth be the focal point of administrative and judicial inquiry under Section 7."

At page 227:

"Analyzing the facts of the present case makes it abundantly clear that under these standards the production and sale of florist foil may rationally be defined by the Commission as comprising the relevant line of commerce in terms of (1) public and industrial recognition of it as a separate economic entity, (2) its distinct customers and (3) its distinct prices. * * *"

In United States v. Aluminum Co. of America et al., supra, aluminum conductor wire and cable was held to be a sub-market and was a separate line of commerce for the purposes of § 7, and this was so in spite of the fact that it had its copper counter-part.

In United States v. El Paso Natural Gas Co. et al., supra [11], 376 U.S. at page 657, 84 S.Ct. at page 1047, the Court said "the production, transportation, and sale of natural gas is a 'line of commerce' within the meaning of § 7." That then is not to say that raw materials may not be a "line of commerce"; for it is conceivable *arguendo et exemplar* that green coffee, commercial diamonds, silk, etc., may be products having a line of commerce within the meaning of § 7.

In United States v. E. I. duPont de Nemours & Co. et al., supra,[12] at page 593, 77 S.Ct. at page 877, it was stated "that automotive finishes and fabrics have sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all other finishes and fabrics to make them a 'line of commerce' within the meaning of the Clayton Act."

Therefore, while a whole industry was considered an appropriate line of com-

merce in the *Bethlehem Steel* and *Philadelphia National Bank* cases, supra, there is no indication as we are guided by the Congressional Reports and by our Supreme Court that Congress intended to exclude from its proscription of anti-competitive mergers those industries which may occur in the economic activity relating to the development, production and processing of raw materials in any sub-market which forms an area of effective competition.

As for the defendants' contention that there is no precedent for considering Penn Grade crude as a line of commerce separate from crude oil in general, they offer United States v. Standard Oil (Indiana), 1964 Trade Cases, ¶ 71,215. In that case the District Court stated: (Page 79,845)

" * * * the Court requested all the parties to submit proposed findings of fact and to agree as much as possible upon the findings of fact they wished the Court to make * * * Defendants agreed to much of the plaintiff's requested findings pertaining to the history of the proceedings, the relevant geographic markets and lines of commerce * * *."

From this it is obvious that no basic determination was made upon which reliance could be had as a guide to an answer for the question of whether Penn Grade crude oil or any other crude oil could or could not comprise an appropriate sub-market or line of commerce. We do not know what precise facts were in evidence to support this finding in the *Standard Oil (Indiana)* case, supra.

The defendants also contend that Penn Grade crude cannot be a line of commerce because the Penn Grade refiners can, if they wish, process non-Penn Grade crude oil. A similar contention was made in the *Reynolds Metals Company* case, supra, where it was argued that the 192 aluminum foil manufacturers of decorative foil could also produce florist foil if these manufacturers wished. The important

11. 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12.

12. 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057.

thing the Court said was that they did not do so. The florist foil was produced only by eight companies and this was the competitive situation that had to be dealt with or considered in determining the anti-competitive effects of the proposed acquisition. What is of interest is, as the Court stated, the product in which the parties actually competed. Similarly, whatever the Penn Grade refiners and their producers have done and do as an industry is presently factual. What it is they can do factually is not what they do do. We must deal with the economic realities of competition as they exist and not on the speculative basis of what they could be. The fact is that the Penn Grade refiners do not do whatever it is that they can do.

The defendants' contention ignores the realities of this particular market place. Regardless of what the possibilities are, Penn Grade crude has not been utilized by other than the Penn Grade refiners for over 15 years, and during that time no Penn Grade crude has been shipped outside the Penn Grade crude producing area. Crudes other than Penn Grade crude are not utilized by the Penn Grade refiners in the manufacture of their lubricants, and their advertising so demonstrates. The fact that a pipeline currently brings Mid-Continent crude oil into the Penn Grade area near Bradford, and runs from there to the Buffalo refining area has no particular significance here since this pipeline neither delivers non-Penn Grade crude into the area nor picks up Penn Grade crude for delivery elsewhere.

The evidence has clearly established that the independent producers of Penn Grade crude can sell their crude only to the six Penn Grade crude refiners. The fact that one of the small refiners does sometimes receive some quantities of outside crude and refines these in small batches is insignificant, and particularly, because they are never comingled or mixed with the Penn Grade crude.

It must be assumed that since factual situations vary from case to case, the conditions and factors of each may not be within the guidelines as expressed in the Brown Shoe Company case, supra.[13] At page 368, 82 S.Ct. at page 1548, the Court said: "The duty rests with the District Court, and ultimately with this Court, to determine what is the appropriate market on an appraisal of the *relevant economic* considerations." (emphasis supplied)

Illustrations are found in the *Reynolds Metal Co.* case, supra, and the *Aluminum Company of America* case, supra.

It is finalized in the Continental Can Co. case, supra,[14] at page 449, 84 S.Ct. at page 1743 in these words:

"Concededly these guidelines (of the Brown Shoe Co. case) offer no precise formula for judgment and they necessitate, rather than avoid, careful consideration based upon the entire record."

▮ Penn Grade crude is found and recoverable only in the Penn Grade crude area lying within the western Appalachian Basin. It has exclusive and unique characteristics not found in other crudes. Its recovery is by more than 2,000 producers. It is sold only in the Penn Grade crude area to distinct customers. It is sold at a distinctly higher price than other crudes, and its price is not affected directly or substantially by the price of other crudes. It is used only by refiners engaged in the specialty business of manufacturing high quality lubricants. It has distinct recognition by the petroleum industry as a separate economic entity. While I am not being called upon here to make a final determination of the question of relevant market as it exists from the evidence presented before me at this hearing, I must conclude as of now that a line of commerce does exist in Penn Grade crude.

Accordingly, I am required to make further inquiry and determination as to whether or not the Penn Grade crude line

---

13. 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510.

14. 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953.

of commerce is within a section of the country as that term is used in § 7.

## SECTION OF COUNTRY

Prior to the adoption of the Clayton Act amending § 7, both the Senate and House committees reported on the proposed H.R. 2734 Bill. Both reports contained clear and unequivocal statements of the intent and purpose of Congress. It manifested expressly the desire of Congress to so broaden § 7 of the then Clayton Act as to make it more flexible and capable of coping with monopolistic tendencies before they would have attained such effects as would justify a Sherman Act proceedings. The Congressional purpose was to prevent situations which were becoming increasing threats to the competitive scheme of our commerce and to free the endeavors of those who were being increasingly compelled to struggle in order to live within that scheme.

The phraseology contained in the new § 7 was pointedly meaningful. Senate Report No. 1775 said this at page 5:

"To make clearer the intent to give the bill broad application to acquisitions that are economically significant, its wording has been broadened in certain respects. Thus, the phrase 'in any section of the country' was made applicable to both the lessening of competition and the tendency to create a monopoly. As the bill originally stood, it applied only to the former. Hence, an acquisition is not to be interpreted merely in terms of either its effect on competition or its tendency to create a monopoly 'in the Nation as a whole.' The act is to be violated if, as a result of an acquisition, there would be a substantial lessening of competition or a tendency to create a monopoly in any section of the country."

The Senate Report continues at pages 5 and 6:

" * * * [Section of the Country] will vary with the nature of the prod-

uct. * * * As the Supreme Court stated in Standard Oil Co. [of California] v. U. S. (337 U.S. 293 [69 S.Ct. 1051, 93 L.Ed. 1371]). Since it is the preservation of competition which is at stake, the *significant proportion of coverage is that within the area of effective competition.*" (emphasis supplied)

And at page 6 it said this:

"In determining the area of effective competition for a given product, it will be necessary to decide what comprises an appreciable segment of the market. An appreciable segment of the market may not only be a segment which covers an appreciable segment of the trade, but it may also be a segment which is largely segregated from, independent of, or not affected by the trade in that product in other parts of the country."

Again referring to the Brown Shoe Co. case, supra,[15] at page 320, 82 S.Ct. at page 1521:

"The deletion of the word 'community' in the original Act's description of the relevant geographic market is another illustration of Congress' desire to indicate that its concern was with the adverse effects of a given merger on competition only in an economically significant 'section' of the country. Taken as a whole, the legislative history illuminates congressional concern with the protection of competition, not *competitors*, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition."

The anti-competitive effects of the proposed merger are to be measured then within the total range of commerce of a product, as it relates to the production and marketing. In the present case the product is Pennsylvania Grade crude oil. Does its production and marketing comprise an appreciable segment of the market as that term was used by Congress?

15. 370 U.S. 294, 82 S.Ct. 1502.

Again referring to the Brown Shoe Co. case, supra,[16] at pages 336–337, 82 S.Ct. at page 1530:

"The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. See S.Rep. No. 1775, 81st Cong., 2d Sess. 5–6; United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593 [77 S.Ct. 872, 1 L.Ed.2d 1057]. Moreover, just as a product submarket may have § 7 significance as the proper 'line of commerce,' so may a geographic submarket be considered the appropriate 'section of the country.' Erie Sand & Gravel Co. v. Federal Trade Comm., 291 F.2d 279, 283 (C.A. 3d Cir.); United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 595–603 (D.C.S.D.N.Y.). Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area."

In a § 7 proceeding, there is no pat formula for determining the relevant "section of the country." The section may be the "area of effective competition," United States v. Bethlehem Steel Corp., supra,[17] 168 F.Supp. at page 596, or it may be the area "in which the seller operates, and to which the purchaser can practicably turn for supplies." Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L. Ed.2d 580 (1961). In any event, the geographic market must be selected on the basis of a "pragmatic, factual approach" not a "formal, legalistic one."

All Penn Grade crude is produced, bought, sold and refined in this area. No Penn Grade crude is brought into or shipped out of the area. It is the only geographic area wherein Penn Grade refiners compete for the purchase of their raw material—Penn Grade crude; and it is in fact the only geographic area wherein the producer-sellers of Penn Grade operate and to which the refiner-purchasers can turn for supplies.

The holding in the El Paso Natural Gas Co. case, supra,[18] at page 657, 84 S.Ct. at page 1047, that California is a "section of the country" for the production, transportation and sale of natural gas within the meaning of § 7 finds support for the Government's contention here that the Appalachian Basin comprising southwestern New York, western Pennsylvania, eastern Ohio and the whole of West Virginia, where Penn Grade crude is produced, transported and sold is a "section of the country" within the meaning of § 7. I so find for the purpose of the present disposition.

Accordingly, the evidence must be further examined in order to determine whether or not the Government has proved that competition will be lessened by the acquisition of Kendall by Pennzoil, or whether such acquisition will tend to create a monopoly within the meaning of § 7.

## COMPETITION

Webster's New International Dictionary, 2nd Edition, Unabridged, 1961, defines the term competition as, "The effort of two or more parties, acting independently, to secure the custom of a third party by the offer of the most favorable terms; also, the relations between different buyers or different sellers which result from this effort." Our country has thrived commercially on the idea that "competition is the life of trade." Competition has given vigor to our economy and energy, and motivation to the competitors in achieving better products and better markets.

The Government's burden is not to show that competition will be lessened

16. 370 U.S. 294, 82 S.Ct. 1502.

17. 168 F.Supp. 576.

18. 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12.

by the acquisition, but only that it may tend to be lessened. In United States v. Aluminum Company of America, et al., supra,[19] the Supreme Court at page 280, 84 S.Ct. at page 1289 restated its holding in the *Brown Shoe Company* case, supra, when it said:

" 'Congress used the words *"may* be substantially to lessen competition" (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a *probable* anticompetitive effect were to be proscribed by this Act.' See also United States v. Philadelphia National Bank, 374 U.S. [321], at 362, [83 S.Ct. 1715, 10 L.Ed. 2d 915], and United States v. El Paso Natural Gas Co., 376 U.S. 651, 658 [84 S.Ct. 1044, 12 L.Ed.2d 12]." (emphasis supplied)

The Senate Report also makes it clear that the proscriptions of § 7 apply where a substantial lessening of competition is threatened, even though competition has not been actually eliminated. "A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." Senate Report No. 1775, supra. As Judge Biggs said in United States v. Ingersoll-Rand Company, 320 F.2d 509, at page 524, C.A.3, 1963:

"Section 7, by its terms, proscribes acquisitions which 'may' have the effect of substantially lessening competition. Congress intended to prohibit transactions with a 'probable' anti-competitive effect, and one of the basic objects of Congress was to prevent steps toward concentration of industry in a given field 'in their incipiency'. * * * "

"Acquisitions may contravene the provisions of Section 7 if they result in the creation of relationships between the resulting company and its customers and suppliers which may bring about competitive advantages to the merging companies detrimental to competition." United States v. Ingersoll-Rand Co., 218 F.Supp. 530, 552 (W.D.Pa., 1963), aff'd. 320 F.2d 500, C.A.3, 1963. In anticipating this possibility, Congress stated:

"The bill [Section 7] is intended to permit intervention in such a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition, even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize. Such an effect may arise in various ways: * * * establishment of retionships between buyers and sellers which deprive their rivals of a fair opportunity to compete." (House Bill No. 1191 at page 8).

Congress aimed to preserve in the new § 7 of the Clayton Act the competition factor in the commercial life of the nation in all of its aspects, and therefore § 7 is not applicable to mergers which promote rather than lessen competition. Brown Shoe Co. v. United States, supra.

Nor is it applicable to acquisitions where the acquired company is in such financial straits that termination of the enterprise seems inevitable. The interpretation of this doctrine goes back many years and is clear. The Clayton Act does not apply in bankruptcy or receivership cases.

In International Shoe Co. v. Federal Trade Comm., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431, it was stated:

" * * * a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss of its stockholders and injury to the communities where its plants were operated, we hold that the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to fa-

19. 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314.

cilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable, is not in contemplation of law prejudicial to the public and does not substantially lessen competition or restrain commerce within the intent of the Clayton Act. To regard such a transaction as a violation of law * * * would 'seem a distempered view of purchase and result.' " United States v. Maryland and Virginia Milk Producers Association, Inc., 167 F.Supp. 799, D.C.Cir., 1958; Beegle v. Thomson, 138 F.2d 875, C.A.7, 1943.

In the present case there is no question of insolvency. The defendants maintain, however, that their merger falls within the congressional exclusions because Congress did not intend to prohibit it. Is this contention of the defendants supported by evidence? Does Kendall have inadequate resources which prevent it from competing effectively or from maintaining its competitive position in the Penn Grade crude industry?

As of January 1, 1965, Kendall's recoverable reserves of Penn Grade crude totaled four million barrels. Based on its 1964 rate of production, these reserves have an estimated life index of over ten years.[20] Seventy-one percent of Kendall's reserves have not as yet been subjected to secondary recovery procedures. Kendall also owns acreage in the Bradford field which is as yet undeveloped, and it has recently engaged with Kewanee Oil Company in a joint venture for the purchase and development of properties in the Middle District of the Penn Grade producing area. It is agreed that any Penn Grade crude oil produced in these properties will be sold to Kendall.

Kendall has at various times purchased Penn Grade crude from fields other than Bradford. It is presently buying crude in West Virginia and in Oil City, Pennsylvania, and exchanging it for crude in the Bradford field. It is also buying crude in Warren and moving it physically into Bradford. While Kendall does not post prices in West Virginia because, under present conditions, it can obtain oil nearer its refinery, nevertheless, the West Virginia fields, experiencing overproduction and prorationing, could become a source of crude oil whenever Kendall finds that it cannot satisfy its demands from presently available and nearer-at-hand sources.

The testimony from Kendall officials indicates that Kendall's reserves are tapped only when it cannot meet its demands through purchases from other producers. There is no evidence before me now as to when such reserves have been tapped or are likely to be tapped in the future. So that while there may be evidence forthcoming at the final hearing of this case, the evidence does establish, at least for the present, a conclusion that Kendall does have available resources which will allow it to meet and maintain its present position in the production, purchase and refining of Penn Grade crude.

The defendants describe Pennzoil and Kendall as "two small companies" who must be permitted to merge in order to compete more effectively with major oil companies. This contention is based on the premise that the relevant market is the crude oil industry in the nation as a whole, and that Pennzoil and Kendall occupy positions numbered 51 and 81 in terms of the "operable refining capacity" of domestic refiners of all crude oils. However, as found earlier, the "relevant market" in which to measure the competitive effects of the merger is that encompassing Penn Grade crude oil (product) and the Penn Grade producing area (section of the country). Nor in this particular instance can the "operable refining capacity" of a Penn Grade crude plant be gauged in the same way and on the same level as those of non-Penn Grade crudes. Neither Pennzoil nor Kendall are within its true significance, in the gasoline business, since this is but a by-

20. Based on statistics contained in the American Petroleum Institute Report for 1964.

980

product of Penn Grade crude. The major oil companies are in the bulk business of producing gasoline with concomitant "lube" business as part of the side products.[20a]

The defendants contend that Penn Grade crude is being depleted to such an extent that Penn Grade crude refiners will soon have to turn to crude oil produced in other areas of the United States to meet their refinery requirements. However, this is not borne out by the defendants' own statements as contained in their Annual Report to their stockholders. Since 1962 both Pennzoil and Kendall have consistently referred to the overproduction of Penn Grade crude and the problems such overproduction was causing in the Penn Grade industry.[21]

The evidence so far establishes that the amount of Penn Grade crude oil produced is controlled primarily by human influence, other than natural causes. Production of Penn Grade crude has been affected by price changes, purchase restrictions imposed by refiner-purchasers, over-production, curtailment of drilling activities and the shutting down or opening up of wells. Mr. Liedtke, President of Pennzoil, stated that some of Pennzoil's properties in West Virginia were being held in reserve for future development at a time when additional quantities of Penn Grade crude are needed. He also stated in July 1963 that the present refiners of Penn Grade crude constitute the only market for such crude and that these refiners had not been able to supply a market to handle all the Penn Grade crude oil produced. He stated that overproduction of Penn Grade crude in West Virginia has caused problems for both the refiner-purchasers and producers.

In the statement made in March 1965, on Oil Import Controls before the United States Department of Interior, Mr. J. P. Jones, President of the Pennsylvania Grade Crude Oil Association, pointed out that the daily average Penn Grade crude production for 1964 amounted to 32,000 barrels, and that estimated recoverable reserves are in excess of 200 million barrels. On the basis of a simple mathematical calculation, using 365 days per calendar year, this would mean that the life of Penn Grade crude amounts to 17.1 years. This exceeds the years of crude oil supplies for the entire nation, estimated to be only 11.71 years.[22]

The defendants also contend that a refinery with an operating capacity of ten thousand barrels per day or less has such costs and technical handicaps which, absent exceptional circumstances, cannot survive in today's market, and that the Government's own evidence in the *Honolulu* case, United States v. Standard Oil Company, 1964 Trade Cases, § 71,215, substantiates these statements. As already stated, this contention completely overlooks the difference in the type of operations between the refiners in the *Honolulu* case and the refiners of Penn Grade crude.

The refineries in the *Honolulu* case were not engaged in manufacturing specialty products such as lubricating oils, but rather in producing primarily gasoline. What lubricating oils, if any, were produced were merely by-products. Their "bread and butter" was gasoline, and to operate on a profitable basis such refineries must operate on a volume basis. In contrast, lubricating oils are generally sold to the consuming public in quart and gallon cans and are not replaced for some considerable interval of time. Accordingly, a refinery manufacturing lubricating oils as its principal product cannot from an economic stand-

20a. These side products include asphalt, wax, kerosene and distillate fuels.

21. In its 1964 Annual Report, Pennzoil indicated that Penn Grade crude production in 1964 was higher than in 1963, and, in regard to the decline in the Bradford area stated: " * * * Our engineering projections indicate the Bradford decline will be arrested by the end of 1965, followed by a slight increase in 1966."

22. American Petroleum Institute, 1964.

point be compared to a refinery which primarily produces gasoline as a bulky product.

While at the hearing defense counsel expressed fear for the survival of Kendall if the acquisition were not permitted and contended that Kendall was too small an economic unit to continue to compete on an equal basis with its larger competitors in an area which is declining economically, the facts establish the contrary.

Since 1961, Kendall's net income has steadily increased.[23] In similar fashion the net incomes of Kendall's main competitors, Pennzoil and Quaker State, have steadily increased since 1961 to all time highs in 1964. Kendall's 1964 Annual Report to its stockholders states:

> "The fiscal year ended October 31, 1964, was an excellent one for your company. Sales and earnings were the highest in Kendall's history. Consolidated net income totaled $1,330,859, an increase of 31% over the previous year * * *"

The evidence is far from convincing that Kendall has not been, and is not now, vigorous and prosperous, or that it is threatened because of economic inroads, or because of nature's failures to give it necessary aliment for its commercial existence. The defendants assert that they are pygmies in the Nation's oil industry, but the evidence is clear that in the line of commerce in the section of the country in which the two defendants are engaged, they are giants. Certainly there is no evidence before me now that Kendall is a feeble or failing company or that it lacks in resourcefulness and needs the aid and guidance of a more experienced and a more influential member among its present competitors to keep it going and keep it a prosperous concern. It may be that this is a fact and such evidence may be forthcoming at the final hearing, but at the present time no evidence appears to support its contention that unless the merger is consummated, it faces grave difficulties in the future and potential failure.

The defendants urge as a further justification of the merger between them, their good motives and economic benefits which they say will flow from the merger. Our present concern must be not with the good motives and intentions of the defendants in seeking to merge their corporate holdings, nor even in assuming that economic benefits can flow from such a merger; because, if the merger is in violation of the statute in any relevant market, then neither good intentions nor benefits can be justification for the merger. United States v. E. I. duPont de Nemours & Co. et al., supra; United States v. Bethlehem Steel Company, supra.[24]

Of particular importance in weighing the evidence for findings of violations under § 7 are the percentage market shares held by the companies involved. In recognizing this, the Supreme Court in the Brown Shoe Company case, supra,[25] at page 343, 82 S.Ct. at page 1534 stated:

> "The market shares which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market. * * * If a merger achieving 5% control were now approved, we might be required to approve future merger efforts by * * * competitors seeking similar market shares."

The proposed merger of Pennzoil and Kendall contemplates the unification of a substantial share of the Penn Grade

---

23. Its net income for the fiscal year ended October 31, 1964, the highest in its history, was 31% above its net income of the previous year. For the year 1963, its net income totaled $1,016,754. For the year 1962, its net income totaled $769,772.

24. 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057; 168 F.Supp. 576.

25. 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 510.

crude oil industry in terms of production, purchasing and refining. Pennzoil is a large, well-financed developer, producer, purchaser and refiner of Penn Grade crude oil. Kendall is also an increasingly successful company in the same industry.

In 1964, Pennzoil ranked first and Kendall second in the production of Penn Grade crude. In that year, Pennzoil produced 3,069,500 barrels of Penn Grade crude, accounting for approximately 25% of total Penn Grade crude production, while Kendall produced 386,170 barrels and accounted for 3% of the total.

Pennzoil is also the second largest purchaser of Penn Grade crude. In 1964, it purchased 3,106,515 barrels, accounting for 26% of total Penn Grade crude production, while Kendall, the third largest purchaser, purchased 995,380 barrels, accounting for over 8% of the total Penn Grade crude production. Since Pennzoil and Kendall are the two largest producers, it follows that by eliminating the production of Pennzoil, Kendall and Quaker State Oil Refining Corporation, the only other refiner with substantial production in the Penn Grade area, the percentage of their purchases from independent producers would be substantially higher. In 1964, these three companies produced approximately 3,800,000 barrels of Penn Grade crude. Of the remaining 8,200,000 barrels produced by over 2,000 independent producers, Pennzoil's 1964 purchases accounted for 38%, while Kendall's accounted for 12%.

There is a direct relationship between (1) the refining of Penn Grade crude and (2) the production and purchase of Penn Grade crude. There are but six purchasers to whom independent producers of Penn Grade can sell their pro-

duction. Of the six, only three bear real significance: Pennzoil, Quaker State and Kendall.[26] In 1964, approximately 11,580,360 barrels of Penn Grade crude were run through the refineries of the six Penn Grade refiners.

Of the total, Pennzoil accounted for approximately 43%, Quaker State for approximately 29% and Kendall for approximately 13%. Thus, the top three refiners accounted for approximately 85% of the refining runs of Penn Grade crude. Consummation of the merger would give Pennzoil alone 56% of all refining of Penn Grade crude. The elimination of Kendall as an independent purchaser from Penn Grade crude producers would mean that over 2,000 independent producers engaged in the production of Penn Grade crude would be dependent on two significant purchasers, instead of three, to provide them with a market.

The Penn Grade refiners have a total refining capacity of 40,320 barrels per day. Of this total, Pennzoil accounts for 40%, Quaker State for 23% and Kendall for 14%. Thus, the top three Penn Grade refiners account for approximately 77% of the total refining capacity of Penn Grade crude. Consummation of the proposed merger would result in Pennzoil's holding 54% and the top two companies 77% of total Penn Grade refining capacity.

Percentagewise, Pennzoil and Kendall exhibit an impressive impact in the Penn Grade crude oil industry. Yet the holdings in both the *Brown Shoe* case and the *Aluminum Company* case show us that far less percentages of control of commerce than these in the instant case can reasonably be factors upon which a likelihood of lessening of competition may be based.

26. Valvoline Oil Company accounted for 13.6% of the total Penn Grade refining capacity; Pennsylvania Refining Company for 4.6%, and Sonneborn Chemical and Refining Company for 4.5%. Of the total number of barrels of Penn Grade crude run through in 1964, the three small refiners together accounted for 13%.

In the United States v. Aluminum Company case, supra,[27] at page 280, 84 S.Ct. at page 1289, the Court said:

"The acquisition of Rome added, it is said, only 1.3% to Alcoa's control of the aluminum conductor market. But in this setting that seems to us reasonably likely to produce a substantial lessening of competition within the meaning of § 7."

Further evidence of the heavy concentration in the Penn Grade petroleum industry is the tremendous rate of attrition among Penn Grade refiners. In 1928, there were 48 plants refining Penn Grade crude, while today there are but ten, and of the ten, Pennzoil and Quaker State each own three. No refinery for the processing of Penn Grade crude has been built in the Penn Grade producing area in over thirty years.

A substantial part of the heavy concentration in the Penn Grade industry has been caused by recent acquisitions made by Pennzoil. Since Mr. Liedtke became its President in 1962, Pennzoil has (1) acquired the remaining 50% of the common stock of Elk Refining Co., a Penn Grade refiner; (2) acquired Wolf's Head Oil Refining Co., a Penn Grade refiner; (3) increased its ownership in National Transit Co. and Eureka Pipe Line Co., the two largest transporters of Penn Grade crude to 91% and 52%, respectively; (4) acquired 8.2% of the common stock of Quaker State; (5) attempted to merge Pennzoil, Quaker State and Kendall into one company; and (6) entered into the agreement with Kendall which is the subject-matter of this proceeding.

■ When large enterprises extend their power by successive small acquisitions, the cumulative effect may lead to monopoly, or lessen competition and it is important to prevent even slight increases which will be likely "substantially to lessen competition." Brown Shoe Company case, supra,[28] at pages 334 and 346, 82 S.Ct. 1502.

The defendants argue that since Kendall and Pennzoil compete in the purchase of Penn Grade crude only in the Bradford field, the elimination of competition between them would be insubstantial. This is not supported by the evidence. Kendall purchases Penn Grade crude produced in New York, West Virginia and the Warren-Youngstown area (Sugargrove Field) of Pennsylvania as well as the Bradford field. The price of Penn Grade crude in the Bradford field has a direct, immediate effect on the price of Penn Grade crude sold in other fields comprising the Penn Grade producing area. In addition, other purchasers of Penn Grade crude are influenced in the price they will pay for Penn Grade crude produced throughout the region by the attitude of Kendall toward a prospective price change.

■ Fear of the "rising tide of economic concentration in the American economy" was Congress's overriding consideration in amending § 7. Brown Shoe Company case, supra,[29] at page 315, 82 S.Ct. at page 1518. "Both the Senate and House Committee Reports emphasized the deep concern of the Congress with the continued trend towards concentration of economic power through mergers and acquisitions." United States v. Bethlehem Steel Company, supra,[30] page 604.

Concentration in control of transportation of crude oil must and does have an important bearing on the elements of competition. By this device, those in control can force or influence producers who are dependent upon them for the disposal of their product. This is particularly true of some small producers in the Penn Grade crude producing area who can sell only to pipeline owner-purchasers.

27. 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314.

28. 370 U.S. 294, 82 S.Ct. 1502.

29. 370 U.S. 294, 82 S.Ct. 1502.

30. 168 F.Supp. 576.

It has been argued also that because of the posted price system of buying Penn Grade crude, the producers do not care to whom they sell. This is, however, opposed to the basic theory of competition. Even though price postings of the purchasers are often identical, each company, including Kendall, is an important factor in the determination of these prices. Mr. Selden, former president of Pennzoil, testified that on one occasion he did not lower the Pennzoil posted price because of indications that Kendall would not follow. The mere existence of Kendall as an independent purchaser presents in itself a substantial deterrent to Pennzoil in this already concentrated area.

It has been stated in evidence that if acquisition is permitted, Pennzoil intends to maintain Kendall as a separate entity and permit it to continue to function in the future as it has been doing heretofore. Under the factual circumstances as they exist, we cannot believe that where one corporation acquires the assets of another corporation and has absolute control over who shall be the officials of the acquired corporation, that human tendency will not constrain the acquiring corporation to favor retention of officials in the subsidiary corporation, who are most compliant and acquiescent to the wishes of those who control them. There can be little, if any, reliance upon the statement in the face of well-known tendencies of human conduct.

In this case, also, it becomes necessary to consider the statement made by the President of Pennzoil that in the future Pennzoil and other refiners in the area would be required to convert over to other crudes and that this could be done collaterally while the Penn Grade crude industry still continued. I have gotten a vague inference that the profit element is now being considered by Pennzoil as it may occur in possible conversion over to non-crudes—and perhaps even to eventually abandoning purchasing and re-

fining Penn Grade crude. It was indicated in evidence by the defendants that because Penn Grade crude was more costly than other crudes and because other crudes can now be processed into as good a lubricant as that obtained from Penn Grade crude, that economically Pennzoil would have a better profit motive to change over.[31] If this were to be done, it would seem, that the present refinery facilities would be utilized, as changed, and other grade crudes would be either picked up from pipelines or spurs of pipelines as they carry crude to New Jersey from the south and from northwest Canada. But this conflicts to a certain extent with the statement of Pennzoil's President that the program for Penn Grade crude recovery would be enhanced and extended if Pennzoil and Kendall were now permitted to combine their funds. The question then is whether, if the acquisition be permitted, there would be an abandonment of the speculative endeavor to acquire more Penn Grade crude fields and better recovery methods as against the more certain and economical change-over to other available and cheaper crudes.

Who controls or owns the shares of stock of Pennzoil and what these owners' interests may be in changing over to other grades is not here made entirely obvious. If those who control production and refining of other crudes seek to compete with Penn Grade crude by acquiring control over the producers, we would have another situation. Will this be a properly competitive venture by which there may be a blending of the two, that is Penn Grade crude and other grade crudes? Although this may not be properly within this inquiry, evidence may be required to ascertain the line of commerce and the section or geographic area of the country if the present determination is not in fact basically correct. Since the evidence has been adduced here only for the purpose of considering

31. The reason offered by defendant Pennzoil for a possible change-over from Penn Grade crude to other crudes was potential inability to procure sufficient Penn Grade crude for its refineries.

whether a preliminary injunction be issued, it is obvious that this is one matter which may need evidence to arrive at a final determination.

The question here is not whether we are to allow competition from the outside to intrude into the Penn Grade area, even though that has been tried on numerous occasions in the past and has failed. It appears from past history that the vigor of the Penn Grade crude industry itself resisted competition from outside crudes. There is nothing to prevent any of the present refiners from either abandoning Penn Grade crude processing, if any so desire. Our present concern is with the competitive factors which have grown up and exist within the Penn Grade crude producing and purchasing markets. This is the line of commerce which is separate and distinct from all other lines of commerce.

In summation then, Pennzoil is the largest producer and refiner and the second largest purchaser of Penn Grade crude. Kendall is the second largest producer and third largest purchaser Pennzoil and Kendall account for 28% of Penn Grade crude production, purchase 34% of Penn Grade crude production, account for 54% of the refining capacity of Penn Grade crude and 56% of its refining runs. The top three companies in the Penn Grade crude industry account for 31% of Penn Grade crude production, over 50% of Penn Grade crude purchases, 77% of the refining capacity of Penn Grade and 85% of Penn Grade crude refining runs.

Should the proposed merger be consummated, it must inevitably follow that (1) competition between Pennzoil and Kendall in the purchase of Penn Grade crude will be eliminated; (2) Kendall will be eliminated as a substantial competitive factor in the purchase of Penn Grade crude from independent producers; and (3) concentration in the production and purchase of Penn Grade crude will be substantially increased.

The Supreme Court in United States v. Philadelphia National Bank, supra,[32] stated at page 362, 83 S.Ct. at page 1741:

" * * * Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. See United States v. Koppers Co., 202 F.Supp. 437 (D.C.W.D.Pa.1962)."

I conclude and find that the merger of Pennzoil and Kendall will substantially lessen competition in the purchase of Penn Grade crude in the Penn Grade crude producing area, the appropriate market and section of the country within which to judge this merger. The next question is whether a preliminary injunction is now a proper remedy.

PRELIMINARY INJUNCTION

The defendants contend that the plaintiff is not entitled to a preliminary injunction on the facts and the law of this case; that in any event, a preliminary injunction at this time would work an irreparable injury upon the defendants; that the granting of a preliminary injunction at this time would be tantamount to final judgment for the plaintiff; and that because the defendants have proposed to keep the to-be-acquired corporation as a separate entity and to continue the relationship between them as it now exists, a preliminary injunction is unnecessary.

As to the defendants' first contention that the plaintiff is not entitled to a preliminary injunction, as is indicated in the findings of fact and conclusions of law and as I have already here stated, there is now before me substantial evidence that the consummation of the acquisition agreement may substantially

32. 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed. 2d 915.

lessen competition within the meaning of § 7 of the Clayton Act.

The Supreme Court in United States v. El Paso Natural Gas Company, supra,[33] at page 657, 84 S.Ct. at page 1048, restated what it had said in the Brown Shoe Company case, supra:

"'Congress used the words *"may* be substantially to lessen competition" (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act.'"

▮ This holding re-affirms prior cases where it was held that when Congress used the words "may tend to lessen competition" it indicated its concern with probabilities not certainties. And so it was that § 7 proscribed merger with probable anticompetitive effect. Brown Shoe Company v. United States, supra; A. G. Spalding & Bros., Inc. v. Federal Trade Commission, 301 F.2d 585, C.A. 3, 1962; United States v. E. I. duPont de Nemours & Co., supra.

Referring to United States v. Ingersoll Rand Co., supra,[34] at page 524, Judge Biggs noted that the trial court is "not required to find that a substantial lessening of competition was a certainty; a determination of the likelihood of a substantial lessening of competition was sufficient." And at page 525, he stated, "The present order does not determine the ultimate rights of the contesting parties but merely maintains the status quo until final hearing can be had and final determinations made in this intricate litigation."

In Ingersoll-Rand, supra,[35] I said at page 547, "The plaintiff's burden here is merely to show that the product lines involved may ultimately be found to be lines of commerce."

▮ No evidence has been here presented that injury will result to either of the defendants by the granting of a preliminary injunction at this time. But in any event, a showing of this kind must be so proportionately persuasive as to submerge the principle that "[t]he status of public interest and not the requirements of private litigation measure the propriety and need for relief." United States v. Ingersoll-Rand Company, supra;[36] United States v. Shafer, D.C., 132 F.Supp. 659, 1955.

▮ Neither is the Government required to show hardship or injury to the public as a part of its burden. *Brown Shoe Company* case, supra. It is not necessary that the Government show beyond a shadow of a doubt that it will ultimately prevail. It is sufficient for the Government to raise questions going to the merits which are so substantial and complex as to warrant this Court in maintaining the status quo until they have been resolved. The legal conclusions which I must now make,

"* * * like * * * [my] fact-findings, are subject to change after a full hearing and the opportunity for more mature deliberation. For a preliminary injunction * * * as indicated by the numerous more or less synonymous adjectives used to label it * * * is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time beingness." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742, C.A. 2, 1953.

Also, (at page 740 of the Hamilton Watch Co. case, supra),

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are pres-

33. 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12.

34. 320 F.2d 509.

35. 218 F.Supp. 530.

36. 218 F.Supp. 530.

ent (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

 It follows that in a suit brought by the Government, where the purpose is to protect the public interest rather than to vindicate private rights, the Government is not required to make an absolute showing to obtain a preliminary injunction.

 Nor can the fear of the defendants that the issuance of a preliminary injunction may finalize the rights of the parties be controlling, since they will be free to pursue their remedies and procedural rights as they may be entitled by evidence at a final hearing of this case. The granting of a preliminary injunction, here, will not foreclose the defendants from any rights to which they may be entitled. It merely maintains the status quo for an eventual finding on whether or not the consummation of this agreement for merger is proscribed by the provisions of § 7.

The final determination must come only after the evidence has been presented in normal and deliberate fashion, rather than hurriedly at a preliminary hearing, so as to allow freedom to counsel and their parties to present pertinent and material evidence in the light of due procedure. As to whether or not a preliminary injunction should now issue as against the defendants' claim that if the plaintiff prevails in the ultimate, divestiture would be a proper procedure, is now a proper question.

## DIVESTITURE

Under the terms of the Joint Plan and Agreement of Merger, all of Kendall's properties, assets, rights, privileges and franchises will be transferred to Pennzoil on the closing date. Kendall is to be

merged into Pennzoil by an exchange of one share of Pennzoil convertible preferred stock for each share of Kendall common stock issued and outstanding.

There has been little, if any, evidence of trade secrets which would pass on the permissible acquisition at the present time, but there would, of necessity, be a transfer of presently owned shares of stock in Kendall with a wielding of voting rights in that company in favor of Pennzoil. And this will not be compensated by the fact that the owners of the present Kendall shares of stock will receive rights of one-half vote per share in the Pennzoil management, for the reason that all of these newly granted certificates in Pennzoil in exchange for Kendall stock will amount to a de minimis right of control over Pennzoil and indirectly of Kendall.

The defendants' contention that Kendall will continue to operate under its present name and management is for present purposes meaningless. Pennzoil will be the sole stockholder of Kendall, and as such will elect Kendall's Board of Directors and determine its policies. For the defendants to urge that Kendall would remain an active competitor of Pennzoil is to totally disregard the realities of the market place.

With the new issue of stock in exchange for Kendall shares, there must be, as time passes, a changing of persons, personnel and conditions; and if it is ultimately determined that a merger is in violation of § 7 and that divestiture must be enforced, there will have been too many changes in the meantime to permit a change-back to the conditions and circumstances as they presently exist in their status quo.

What I said in United States v. Ingersoll Rand, supra,[37] at page 543, applies equally to the facts of this case:

"One may seriously doubt that the parties, after years or after only a few months, will be able through divestiture to disintegrate so as to recreate

37. 218 F.Supp. 530.

or re-establish the status quo of all the companies and related matters as of the time of the granting of this preliminary injunction. For, no matter how well planned, and how carefully the composition of all its elements may be, the decomposition no matter how well and thoroughly executed, must invariably leave inevitable changes."

We give serious consideration to the words of Congress in the Senate Report at pages 4 and 5, where this is said:

"The intent here, as in other parts of the Clayton Act, is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding."

The purpose of § 7, then, is not only to prevent a substantial lessening of competition, or the tendency to create a monopoly, but also to arrest incipient threats to competition where they appear at the time of suit to be reasonable probabilities as proscribed by that section. United States v. Penn-Olin Chemical Co., 378 U.S. 158, 1964, 84 S.Ct. 1710, 12 L.Ed.2d 775; United States v. El Paso Natural Gas Company, supra; United States v. Aluminum Co. of America, supra; United States v. Ingersoll-Rand Company, supra (320 F.2d 509).

Both the plaintiff and the defendants have submitted considerable evidence of the fact that the acquisition as proposed may substantially lessen competition and tend to create a monopoly. I am convinced that now the issuance of a preliminary injunction rather than reliance upon the remedy of divestiture in the future is required by the mandate of Congress as it applies to the facts of this case.

An injunction will therefore issue preliminarily against the defendants Pennzoil and Kendall until final hearing when a determination may be had on whether the proposed acquisition by Pennzoil by Kendall's shares of stock and assets violates the proscriptions of § 7 of the Clayton Act.